Bernard A. LEVIN, Phyllis Levin, Alan T. Hrabosky, and Delores Hrabosky, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Nos. 87–1419, 87–1420.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1987.

Decided Oct. 20, 1987.

---

Lloyd E. Shefsky, Shefsky, Saitlin & Forelich, Ltd., Chicago, Ill., for petitioners-appellants.

Gayle P. Miller, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WOOD, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Thermoplastics Engineering Co. (TEC), a manufacturer of food processing machinery in Illinois, had trouble raising money for new projects. Ihor Wyslotsky, a mechanical engineer, and Lloyd Shefsky, a tax lawyer, owned TEC; they caused the formation of general partnerships in Israel through which TEC indirectly acquired funds. The principal question in this case is whether these partnerships were engaged in the sort of research and development for which § 174(a)(1) of the Internal Revenue Code of 1954, 26 U.S.C. § 174(a)(1), allows an immediate deduction. The Tax Court answered no, 87 T.C. 698 (1986). That court's opinion lays out the facts; we simplify brutally.

Each Israeli partnership agreed to invest money in one or more projects. The investments were project-specific. One partnership, for example, paid for the development of bacon board dispensers—a product for which the market in Israel was limited, but for which there might be a market in the United States. The partnerships raised money in dollars; obligations were stated in Israeli currency. The partnerships agreed to supply TEC's nominee (or engineering firms doing work on the projects) three waves of money. They supplied immediately most of the money contributed by the partners in 1979. On TEC's achievement of an engineering benchmark expected to occur in May 1980, they raised and handed over a sum a little larger than the 1979 payment. Finally, each partnership was obligated to make payments in 1994 and 1995, roughly three times the size of the initial two installments combined, called "development fees". TEC and affiliated firms could collect these fees before 1994 only out of the partnerships' income from the food machines. Each unit in the partnerships cost $1,000 (representing sums payable in 1979 and 1980), and each partner was personally liable for the partnerships' 1994 and 1995 obligations to the extent they could not be met from royalties. The partnerships involved in this case raised about $900,000 in 1979 and 1980.

The partnerships used the accrual method of accounting. In 1979 each partnership booked as a debt the fees due in 1979, 1980, 1994, and 1995. This produced an immediate "loss" more than four times the cash investment the partners made. The debt for the 1994 and 1995 payments also carried interest at 10% per annum through 1981 and 8% thereafter. The interest was payable with the principal, but the accrual-basis partnerships booked losses each year to represent interest. The investors in this case, two couples filing joint returns, converted the partnerships' accrued losses to dollars at the prevailing rate of exchange and deducted them. "Losses" representing the 1979, 1980, and 1994–95 payments each taxpayer deducted as "research or experimental expenditures which are paid or incurred ... in connection with his trade or business" under § 174(a)(1). The other

losses the taxpayers deducted as interest expenses under 26 U.S.C. § 163.

In 1979 Israeli currency was undergoing inflation and devaluation against the dollar. Israel had experienced inflation at 24–56% per year since 1973; in the fourth quarter of 1979, when the partnerships were formed, the annual rate was 168%, and the central bank was predicting a rate in excess of 100% for 1980. 87 T.C. at 716–17. The payments due in 1994 and 1995 were not indexed, and the stated rate of interest was substantially less than the going rate for private-sector loans in Israel. If the rate of inflation between 1979 and 1994 were 39% per year (the average from 1973–78), the partners would be able to satisfy their obligations in 1994–95 (including interest) by contributing about $52 per $1,000 unit—despite having deducted in 1979 about $4,000 per unit.[1] (The rate of inflation turned out to be much greater, reaching 1000% in 1984 alone, but the difference hardly mattered given the effects of a 39% rate. 87 T.C. at 719–20.) The difference would be subject either to recapture in 1995 or to an offset reflecting a profit from currency speculation, see *Willard Helburn, Inc. v. CIR*, 214 F.2d 815 (1st Cir.1954), but the partners would have received the time value of the money for 15 years. That time value, at interest rates prevailing in the United States, exceeds $4,000 per unit, so it looked like the partners would quadruple their investment even if the food machinery business was a bust. Some combination of the high deduction per dollar invested and the statement of the debt in an inflating currency caught the Commissioner's eye.

■ The Tax Court disallowed the principal deduction because, it concluded, the partnerships were investing not in *their* trade or business but in TEC's. 87 T.C. at 723–28. Section 174(a)(1) allows a deduction only for "research or experimental expenditures" paid or incurred "in connection with his [i.e., the taxpayer's] trade or business".[2] The court then disallowed the deduction for interest, concluding that the debts served no genuine economic function—in other words, were shams. 87 T.C. at 728–34. The chief evidence was the 8% rate of interest when inflation in Israel exceeded 100% a year. Both of these subjects—*whose* "trade or business" was involved, and whether the partners expected to pay anything in 1994–95—have at their core fact-specific questions of characterization on which we must accept the Tax Court's findings unless clearly erroneous. *Illinois Power Co. v. CIR*, 792 F.2d 683, 685, 687 (7th Cir.1986); *Falkoff v. CIR*, 604 F.2d 1045, 1049 n. 6 (7th Cir.1979); 26 U.S.C. § 7482(a)(1). Cf. *Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986).

■ *Snow v. C.I.R.*, 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974), establishes that a firm may make research expenditures "in connection with [its] trade or business" within § 174(a)(1) even though at the time of the expenditure the firm has *no* business other than the research. The statute allows deductions to start-up firms no less than to established firms. The taxpayers portray the partnerships in this case as start-up ventures covered by *Snow*. The Tax Court gave this argument a frosty reception. The partnership in *Snow* invested in developing the ideas of its general partner, an inventor. The partnership expected to produce and sell the machines itself, if the development effort were successful. The partnerships in this case were formed to supply cash so that TEC could develop Wyslotsky's inventions. The general partner, far from being an inventor, visited a food machinery plant for the first time when escorted to one after the partnerships were formed. No one affiliated with any of the partnerships had expertise

---

1. This sum comes from converting $3,000 in 1994 to present value in 1979 at 31% interest (39% inflation less the 8% interest provided by the contract). The result is $52.52 in 1994 dollars, the amount the investors would have to pony up. It would take about $14, invested in the United States in 1979 at the readily-available return of 9%, to produce this sum by 1994. So investors would have perceived the full cost of each $1,000 unit as about $1,014.

2. The "taxpayer" for this purpose is the partnership. *Campbell v. United States*, 813 F.2d 694, 695–96 (5th Cir.1987).

in food machinery. The Tax Court was entitled to find that these partnerships were and expected to remain passive investors, that the "trade or business" of making food machines was TEC's. 87 T.C. at 725, 728.

The taxpayers insist that there was more to the partnerships than that. On paper there was. The partnerships formally engaged engineering firms to do research; they did not simply send all sums to TEC (though they did remit more than half). They were entitled to buy and stock completed machines for resale (though they were not obliged to do so); they were supposed to receive collateral technology developed in the course of producing the food machines, and presumably they could have used this technology to develop and market other machines without TEC's aid or blessing. Although this was not as much involvement in an operating business as the partnership in *Snow* contemplated, it was more (on paper) than the partnership in *Green v. CIR*, 83 T.C. 667 (1984). That partnership released, by contract, all of the normal attributes of an R & D venture. The taxpayers want us to use *Green* as the benchmark, so that any "potential" for entering the manufacturing and selling end of the business is enough to classify the R & D as part of the partnership's "trade or business."

■ The concept of "trade or business" is plastic, *CIR v. Groetzinger*, — U.S. ——, 107 S.Ct. 980, 983–88, 94 L.Ed.2d 25 (1987), but it hardly follows that anything goes. The taxpayers take a "magic words" approach to the subject: if the partnership's documents contain the right language, then all is well. The Tax Court looked past the documents to the expectations of the parties at the time. It asked whether the partnerships reasonably anticipated availing themselves of the privileges they possessed on paper. That is the right question; pen and ink divorced from reasonable business expectations do not a "trade or business" make. These partnerships were formed by TEC's principals; TEC was an established business needing capital; the partnerships were dominated by TEC and had no independent expertise in the food machinery business; they were privileged but not compelled to participate in the marketing of any machines TEC constructed. This permits the Tax Court to conclude that the partnerships were (and intended to remain) passive investors.[3] The uncertain contours of "trade or business" create opportunities for fair debate. Fair debates about fact-bound matters of characterization are resolved on appeal in favor of the solution the trier of fact reaches. The Tax Court wrestled with the right way to characterize the partnerships' plans; the ambiguities in the legal rules (and their own plans) on which the taxpayers play also mean that the Tax Court is not clearly wrong.

■ We are conscious that in tax law form often is substance, *Howell v. United States*, 775 F.2d 887, 890 (7th Cir.1985), but to take advantage of that principle the taxpayers must observe the forms they establish. Calling TEC's bacon board dispenser a banana would not entitle the investors to a tax break for agricultural products. The Tax Court found that the partnerships were not equipped, and did not plan, to go into the food machinery business. That the partnerships possessed the legal entitlement to do so is not dispositive. Even a firm that has surrendered by contract all rights to the product, as in *Green*, may renegotiate the contract; in this sense every investor has the "potential" to be a

---

**3.** The Tax Court also made much of how things turned out. TEC made and sold the machines by itself and did not pay the partnership all of the agreed royalties. The partnerships were so passive that they did not even pursue TEC for the missing payments. No technology has been transferred. Although all the partnerships still exist, none is active. To the extent the Tax Court was judging the partnerships with the benefit of hindsight, we do not rely on any of these considerations. The tax treatment in 1979 depends on circumstances in 1979, not on what happened later. But the Tax Court was entitled to inquire whether subsequent events are consistent with its judgment of the facts available in 1979—that is, that the partnerships were nothing but *rentiers*. Its reference to these matters does not show that the court was confused about the appropriate inquiry.

manufacturer. The legal entitlement must be backed by a probability of the firm's going into business. This ordinarily will be so only when it is in the venture's private interest to manufacture and sell any products that the development effort produces. The taxpayers did not offer to prove that it would have been rational for the partnerships to do so; they did not attempt to show the anticipated value of the collateral technology to which the partnership would acquire legal rights (though surely people knowledgable about food machinery could have offered evidence about the usual value of technology rights in that business); the taxpayers rested on the demonstration that the partnerships had the bare legal entitlement to stock and sell the machines and go into business using any technology they acquired. The Tax Court was entitled to find that legal entitlements, divorced from economic incentives and business probabilities, are not enough.

We arrive at the question of interest. The taxpayers would have us believe they did the government a favor. If they had stated interest at the going rate for private loans in Israel, the interest deductions would have been larger; why should the Commissioner protest about the savings to the Treasury? How, they add, were they to know that inflation would continue? Had inflation promptly been curtailed or reversed (as it was by 1986, when the Israeli shekel underwent a 1.4% deflation), the 8% rate could have been appropriate. On top of that, taxpayers say, the Office of the Chief Scientist of Israel was making R & D loans at 8%, providing a benchmark for their rate. The Commissioner responds that these loans were subsidized, and that only the unsubsidized private rate should count.

■ The question is not whether 8% is a permissible rate in the abstract; it is whether the debt purportedly due in 1994–95 was genuine. No debt, no interest. *Goldstein v. CIR,* 364 F.2d 734 (2d Cir. 1966). The Tax Court found that the 8%

rate ensured that "the periodic payments liabilities served no purpose beyond generating tax deductions under sections 174 and 163." 87 T.C. at 729. That finding is not clearly erroneous. By 1994 the debt stated in shekels would be worthless. No one would trouble to collect it; and if anyone did, the partners could satisfy it with pocket money. If the debt had been indexed, or if it had borne interest at the rate in the private market, it would have had the same real value in 1994 as in 1979: that is to say, about $3,000 for every $1,000 initially invested. *That* amount—some $3 million for the partnerships involved in this case, which were not TEC's only financing vehicles—would have been worth collecting. TEC would have had an obligation to its shareholders to pursue the partnerships vigorously. TEC, which was acquired in 1983 by Allstate Insurance Co. and Hambro America, Inc., surely would do so if the debt had value in 1994. The partnerships had to fear just such an event. The 8% rate ensured that there would be nothing worth TEC's trouble.

■ The taxpayers' protest—"How could we know that inflation would continue?"—rings hollow. The placement memoranda for the partnerships predicted inflation; the central bank's prediction at the time the partnerships were formed was for more than 100% inflation in 1980; the market in private loans, reflecting the collective wisdom of private investors, was charging interest of 75% or so. Prices in voluntary transactions incorporate much information, and these prices spoke volumes.[4] Doubtless a rate of 100% + could not continue forever; austerity had to intervene. But the partnerships did not need 168% inflation every year to reduce these debts to confetti by 1994. A rate of 40% would do as well. And recent monetary history in Israel-influenced no doubt by the fact that the government's budget exceeded 100% of gross national product—gave

---

4. Cf. *Bryant v. CIR,* 790 F.2d 1463 (9th Cir.1986), holding that a debt payable in beavers was not genuine to the extent the animals were valued at more than the price for which beavers could be purchased in arms'-length transactions. We need not decide whether a debt payable in rabbits, which have a built-in hyperinflationary factor, should be treated differently.

the partners confidence that they would get at least this much shelter.

Many of the problems we have addressed were tackled in the Internal Revenue Code of 1986. The new "at risk" rule, 26 U.S.C. § 465 (1986), provides that investors may not deduct more than the amount for which they are indisputably at risk. That would have been $1,000 per unit. The new treatment of debt bearing interest less than market rates, 26 U.S.C. § 7872 (1986), added in 1984, would have required the partnerships to restate the debt at its expected value, essentially discounting to present value by the difference between the market rate of interest and the rate stated in the contract. The kind of arrangement we have reviewed therefore would not throw off significant tax benefits even if it were a genuine research and development venture. We are confident that the Tax Court provided the appropriate treatment to these partnerships under the 1954 Code, once it determined that they were passive investors and that the debts lacked substance.

AFFIRMED.