CRAIG J. HATTIER and CHARLOTTE WOOD HATTIER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hattier v. Commissioner
Docket No. 3724-86
United States Tax Court
T.C. Memo 1990-2; 1990 Tax Ct. Memo LEXIS 2; 58 T.C.M. (CCH) 1109; T.C.M. (RIA) 90002; January 2, 1990
Gary James Joslin, for the petitioners. Linda West, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined a deficiency in petitioners' 1982 Federal income tax in the amount of $ 55,179, together with additions to tax pursuant to sections 6653(a)(1), [1]6653(a)(2) and 6661(a) in the respective amounts of $ 2,759, 50 percent of the interest due on $ 55,179, and $ 5,518. Respondent also determined that the entire deficiency was attributable to a tax motivated transaction and thus seeks increased interest pursuant to section 6621(c). [2]
*4 The issues for decision are: (1) whether petitioners are entitled to a claimed deduction for research and experimental expenditures; (2) whether petitioners are liable for additions to tax pursuant to section 6653(a) for negligence; (3) whether petitioners are liable for the addition to tax pursuant to section 6661(a) for substantial understatement of income tax; and (4) whether petitioners are liable for additional interest pursuant to section 6621(c) for an underpayment attributable to a tax motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated and are so found. So much of the stipulation of facts and exhibits attached thereto as we find relevant are incorporated herein by this reference. Craig J. Hattier (hereinafter referred to as petitioner) and Charlotte Wood Hattier, husband and wife, resided in New Orleans, Louisiana, at the time the petition herein was filed. Petitioner is an attorney engaged in the general practice of law as a sole practitioner. Having had an exceptionally profitable year from his law practice in 1982, petitioner sought an investment offering tax advantages. In this regard, he spoke to Walter Wainwright (Wainwright), *5 whom he had known for years, concerning a potential investment in the Sea Star 2 research and development program (the Sea Star R&D program). The Sea Star R&D program was marketed by Sea Star Industries, Inc. (Sea Star), a Canadian corporation, through its president Lawrence Matanski (Matanski), pursuant to a private placement memorandum dated August 1, 1982 (the Offering Memorandum). Under the terms of the offering, Sea Star was to perform research (on behalf of the investor) leading to the development of components for a twin-engine amphibian airplane (designed by Matanski) to be known as the Avalon Twin Star 800 (Avalon Twin) and manufactured by Airmaster, Inc. (Airmaster), a Washington state corporation. (Wainwright was an officer of Sea Star and was involved in the promotion of the Sea Star R&D program.) The Avalon Twin was an advanced version of a single-engine plane known as the Avalon 60 (the Avalon), which like the Avalon Twin had been designed by Matanski. A prototype of the Avalon was built and flight tested; however, as of the date of trial, no certificate of airworthiness had been obtained from the FAA for the Avalon. The Avalon Twin consisted of 185 components. *6 Pursuant to the Sea Star R&D program, each investor paid Sea Star a fixed price for the research and development (R&D) associated with the particular component purchased by him, and each investor obtained the right to commercially exploit the technological information obtained from such research. (R&D of the components for the Avalon had previously been marketed by Tri-Liner International, a corporation in which both Matanski and Wainwright had an interest.) The aggregate price for all 185 components was to be $ 4,856,600, $ 1,618,865 of which was payable currently in cash and $ 3,237,735 in deferred installments. As of January 1985, 51 investors had paid for research for components (which comprised approximately one-half of the plane) for a total price of $ 3,651,655. (The price paid for the components included design, drawings, stress analyses, tooling, and manufacture of a prototype part, as well as their assembly.) On August 13, 1982, Sea Star subcontracted the R&D work it was to perform on behalf of the investors to Airmaster. Pursuant to the subcontract agreement Airmaster was obligated to: (a) carry out the detailed engineering and fabrication of such components for *7 the aircraft as specified by Sea Star; (b) design and construct such prototype and production tooling as specified by Sea Star; (c) assemble all components into and complete fabrication of the prototype aircraft; and (d) conduct all flight and other tests required in order to obtain an FAA certificate for the aircraft. Airmaster's services were to be performed in accordance with the budget prepared by Sea Star; Sea Star was to provide all funds necessary for Airmaster to carry out its obligation under the subcontract. The basic design of the Avalon Twin had been completed in 1981. A prototype of the Avalon Twin was not built because of its similarities with the Avalon. Due to financial difficulties, the Avalon Twin never reached the assembly stage. Petitioner decided to invest $ 40,500 in cash in the Sea Star R&D program; at petitioner's request, Wainwright "pick[ed] out components that matched that amount." On November 15, 1982, petitioner signed an agreement (the Purchase Agreement) to purchase R&D associated with the following three components for the Avalon Twin: Component
Price
Water pumping manifold lines
$   4,400
and assembly
Top fuselage frames and tooling
112,000
Fuselage tail cone and tooling mould
5,100
Total Purchase Price
$ 121,500
*8 The $ 121,500 purchase price was payable as follows: $ 20,500 upon signing the Purchase Agreement; $ 20,000 in five consecutive monthly installments of $ 4,000 each, the first of which was to commence on December 15, 1982; and $ 81,000 on December 31, 1992, with interest at the rate of 10 percent per annum (petitioner's obligation to make this latter payment was evidenced by a recourse note). Concurrently with the execution of the Purchase Agreement, petitioner entered into a nonexclusive licensing agreement (License Agreement) with Sea Star and Airmaster for the commercialization of the R&D to be performed on his behalf. The License Agreement gave both Airmaster and Sea Star the right to use the research information (owned by petitioner) in connection with the manufacturing and marketing of the individual components; petitioner was to receive a royalty payment of $ 1,215 each time his three components were manufactured, assembled, and installed on an aircraft. Petitioner paid Sea Star $ 20,500 on November 15, 1982, and $ 4,000 on December 15, 1982. Because of personal financial difficulties, petitioner made no further payments to Sea Star, and Sea Star made no efforts to collect *9 the amount owed. Instead, Matanski modified Sea Star's records in order to reduce the amount of cash petitioner had invested ($ 24,500 rather than the $ 40,500) and to reduce the amount of petitioner's debt obligation. (Most investors in Sea Star's R&D program paid one-third of the purchase price in cash and incurred a debt obligation for the remaining two-thirds. Matanski reduced the amount of petitioner's note to $ 49,000 in order to maintain a two to one ratio between debt and cash financing.) Matanski testified that he did not want Sea Star to pay taxes on petitioner's $ 16,000 cash shortfall and that he intended to proportionately reduce the royalties to which petitioner was entitled. (At the time of trial, no Avalon Twins had been sold; accordingly, no royalties had been generated.) The successful exploitation of the R&D information owned by each investor depended upon the R&D being performed on other components. The components associated with petitioner's investment would not, without modification, fit a plane other than the Avalon Twin. The Offering Memorandum consisted of 24 pages, one-third of which dealt with tax considerations. The Offering Memorandum recommended *10 that each investor adopt the accrual method of accounting for tax purposes. The Offering Memorandum stated that all R&D would be completed by the end of 1982 because the Internal Revenue Service might otherwise "dispute the amount of the contract price for purposes of deducting research and experimental expenses incurred if the work were not completed before the year end by asserting that the promissory note may only be treated as an expense incurred in the year in which services are rendered." By letter dated December 26, 1982, Sea Star notified petitioner that the R&D with respect to his components had been completed; a certificate of completion signed by Matanski accompanied the letter. (Airmaster did not keep records as to when R&D on specific components began or ended. The only evidence produced at trial to substantiate when the R&D took place (other than the certificate of completion) were two undated drawings of a portion of the Avalon Twin. Matanski testified that although he had no personal knowledge as to when the R&D on petitioner's components was completed, he was informed by one of the draftsmen that such R&D was completed in December 1982.) Although petitioner *11 was entitled to receive the plans and other information resulting from the R&D to be performed on his behalf, he did not request them. During 1984 and 1985, Sea Star offered each investor an opportunity to have a portion of the interest due under his note forgiven if the investor made an advance payment in an amount equal to two years of interest; each investor was also given an opportunity to receive stock in Sea Star in exchange for making an advance payment with respect to his note. Matanski testified that in 1986 all investor notes were assigned to a Mr. Chou in exchange for Chou's agreement to have the Chinese government purchase airplanes totaling $ 10 million. In 1987, a new corporation (Avalon Aircraft, Ltd.) was formed to acquire ownership of all the technology owned by the investors in the Avalon and the Avalon Twin components in exchange for stock of such new corporation. Petitioners' 1982 return (which was filed on July 29, 1983) included several Schedules C. On one of said Schedules C, petitioner was named as the proprietor of an aircraft development business, the cash method was indicated as the accounting method used by said business, and a deduction for R&D *12 was taken in the amount of $ 121,500 (which gave rise to a loss in a like amount). Respondent disallowed the claimed R&D deduction and resulting loss; he contends that petitioner was not engaged in the trade or business of developing and marketing aircraft components. Alternatively, respondent contends that even if petitioner were in such a business, he failed to prove that the R&D was conducted in 1982. Finally, respondent argues that petitioner was not at risk with respect to his debt obligation to Sea Star. OPINION Section 174(a)(1) provides that a taxpayer may elect to "treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account." Expenses so treated are deductible in the taxable year in which paid or incurred. The provisions of section 174(a)(1) apply not only to costs paid or incurred by the taxpayer for R&D undertaken directly by him, but also to costs paid or incurred on his behalf by someone else. Sec. 1.174-2(a)(2), Income Tax Regs. *13 Thus, initially we must determine whether petitioner was engaged in the trade or business of manufacturing and marketing aircraft components. In Green v. Commissioner, 83 T.C. 667, 686 (1984), we held that, for purposes of section 174, the phrase "in connection with a trade or business" should not be construed as restrictively as the term "trade or business" used elsewhere in the Code. We cautioned that in order to be permitted a deduction under section 174: the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business * * * [Green v. Commissioner, supra at 686-687.] Passive investment and delegation of business responsibilities to others do not constitute a trade or business. See Drobny v. Commissioner, 86 T.C. 1326, 1343-1348 (1986). Petitioner contends that his trade or business consisted *14 of his right to license and market aircraft component technology developed on his behalf by Sea Star and Airmaster. Such contention, respondent claims, "amounts to an attempt to transmogrify a passive investment into a trade or business in order to qualify for deductions under section 174." We agree with respondent. To constitute a trade or business, a venture must be entered into with an actual and honest objective of making a profit. Section 183; Soriano v. Commissioner, 90 T.C. 44 (1988); Green v. Commissioner, supra at 687. In this regard, "profit" means economic profit, independent of tax savings. Beck v. Commissioner, 85 T.C. 557 (1985). A venture devoid of economic substance is not recognized for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Knetch v. United States, 364 U.S. 361, 366 (1960). In Rose v. Commissioner, 88 T.C. 386, 414 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we *15 applied an integrated approach to "separate the real economic aspects from the 'financial fantasies' surrounding a transaction." The Rose approach first investigates whether the venture was primarily organized to generate tax savings and should be deemed a generic tax shelter. Once categorized as a generic tax shelter, the venture is then analyzed with objective factors to determine whether it is devoid of economic substance and should be disregarded for tax purposes. In Rose, we noted that while the subjective test is well founded in section 183, a unified approach emphasizing objective factors is preferable in cases involving generic tax shelters. Rose v. Commissioner, supra at 414. Under the Rose analysis, the objective and subjective tests merge into an approach in which the objective test incorporates factors considered relevant in cases decided under section 183, as well as concepts underlying sections 162 and 167. Rose v. Commissioner, supra at 414-415. Generic Tax Shelter
A generic tax shelter possesses some or all of *16 the following common characteristics: (1) Tax benefits were the focus of the promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to the tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or substance. [Rose v. Commissioner, supra at 412.] Here, we believe the Sea Star R&D program is a generic tax shelter because: (1) tax benefits were the focus of the promotional materials; (2) petitioner accepted the terms of the purchase without price negotiation; in fact, the components with respect to which petitioner allegedly purchased R&D apparently were selected by Wainwright (who financially benefitted from petitioner's investment) without consulting petitioner and after petitioner told him how much he could invest; (3) the R&D petitioner purchased *17 was difficult to value and consisted of little, if any, tangible property; and (4) approximately two-thirds of the purchase price was deferred using a promissory note which was in effect disregarded by the parties. As a generic tax shelter, we must next decide whether the Sea Star R&D program lacked economic substance. Smith v. Commissioner, 91 T.C. 733, 753-756 (1988). Economic Substance
In Rose, we found the following four factors to be of particular significance in our analysis of whether the transaction had economic substance consonant with its intended tax effect: 1) the dealings between the promoter and petitioners, 2) the relationship between sales price and fair market value, 3) structure of the financing, and 4) perceived congressional intent. Rose v. Commissioner, supra at 415-422. Application of these objective factors to the facts in this case (as discussed hereafter) demonstrates that the Sea Star R&D program lacked economic substance. 1. The Dealings Between Sea Star and Petitioner
The information petitioner *18 received from Sea Star was geared significantly toward tax advantages that purportedly would be derived from investing in the Sea Star R&D program. Petitioner neither sought nor received any information regarding how he could commercially exploit the components unless the Avalon Twin was successfully completed. Nor did petitioner analyze the probability that the Avalon Twin would be completed. The agreement petitioner entered with Sea Star did not guarantee production of any airplanes; in fact, the agreement pointed out that nothing of commercial value might ever result from the research. Although the agreements entered into by petitioner gave him the right to market the components to other airplane manufacturers, it is doubtful that the components would be of any commercial value to anyone other than Airmaster and Sea Star given the fact that the components would not, without modification, fit any plane other than the Avalon Twin. Furthermore, the agreements petitioner entered into gave him no input into the management of the R&D with respect to his components or to their marketing. The Avalon Twin was divided into 185 component parts, and such parts were sold to 51 investors. *19 Altogether, the investors purchased approximately one-half of the plane. Therefore, even if the investors banded together to market the components, they would be attempting to market one-half of a plane, and one-half a plane will not fly. Not surprisingly, petitioner never did (and apparently never will) receive income from his investment in the R&D. In our opinion, petitioner did not act in a businesslike manner. He failed to seek or receive independent valuation or distribution information despite the fact that he was utterly inexperienced in the aircraft industry. Moreover, there is no evidence that petitioner received or analyzed any cash flow or income projections with respect to the Sea Star R&D program. Instead, he chose to rely upon the advice of Wainwright, who promoted such program. In summary, petitioner failed to show that he devoted the time or effort with respect to his investment in the Sea Star R&D program consonant with an actual profit objective. 2. Relationship Between Sales Price and Fair Market Value
Petitioner agreed to pay Sea Star $ 121,500 to have R&D performed on his behalf. Of this amount, only one-third was to be paid currently in cash, *20 and the balance was deferred over a 10-year period. Neither party presented testimony with respect to the fair market value of the R&D information purchased by petitioner. Nor was any evidence presented regarding the method employed by Sea Star in setting the purchase price. We note that the Purchase Agreement provided that the R&D would be completed by 1982 year end; however, the only funds available to pay for the R&D were the cash payments which constituted one-third of the purchase price. Thus, if only one-third of the purchase price was currently available to complete the R&D, it would appear that either the price of the R&D was inflated, or the project was underfunded and doomed to failure from the beginning. Given the circumstances of the transaction, we believe the former to be more likely than the latter. We further note that in fact petitioner paid only $ 24,500 of his purported $ 121,500 investment. He nonetheless deducted the entire $ 121,500 on his 1982 Federal income tax return which resulted in tax savings of over $ 50,000. 3. Structure of the Financing
*21 The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of lack of, or exaggeration of, economic substance. Rose v. Commissioner, supra at 419 and cases cited therein. On the other hand, bona fide third-party debt may indicate that a transaction, or at least part of it, should be recognized. Rose v. Commissioner, supra at 419-420; see Packard v. Commissioner, 85 T.C. 397, 426-428 (1985). Here, petitioner was obligated to pay one-third of the purchase price in cash as follows: $ 20,500 at the time of signing the purchase agreement on November 15, 1982, and five consecutive monthly installments of $ 4,000 each, beginning on December 15, 1982, and then on the 15th of each succeeding month. He failed to pay four of the $ 4,000 installments, or a total of $ 16,000. And neither Sea Star nor Matanski made any effort to collect the unpaid amount. Moreover, various deals were offered to investors with respect to their notes. Further, the notes, which were not due until 1992, were allegedly assigned to a man in China in return for his promise to persuade the Chinese government to *22 purchase planes from Sea Star. In 1982, petitioner had already received the benefit he sought from his investment (the $ 121,500 tax deduction). Thus, he has no incentive to repay his note. Matanski's reducing the face amount of petitioner's note and concomitant "writing down" of the royalties petitioner was to receive was a feeble attempt to encourage payment, given the fact that no sales of the Avalon Twin had occurred or were likely to occur. In our opinion, the likelihood of petitioner ever fulfilling his obligation, or Sea Star or Matanski making any meaningful effort to enforce repayment of petitioner's note, was virtually nonexistent. The function of the note was solely to increase the amount of tax deductions; the note did not represent a true obligation of petitioner. 4. Perceived Congressional Intent
Petitioner contends his deduction was a legitimate use of the section 174 deduction for R&D expenses created by Congress to encourage "research and experimentation" by "small or pioneering business enterprises, as well as by established ongoing businesses," and its purpose is to somewhat "'equalize the tax benefits of the ongoing companies and those that are *23 upcoming and about to reach the market.'" Green v. Commissioner, supra at 686, citing Snow v. Commissioner, 416 U.S. 500, 502-503, 504 (1974). We do not believe that the Sea Star R&D program is the type Congress sought to encourage through the enactment of section 174. From our examination of the record herein we are satisfied that petitioner's involvement in the Sea Star R&D program was to obtain tax deductions rather than to develop a new product. In our opinion, petitioner engaged in the Sea Star R&D program primarily, if not exclusively, to obtain tax deductions in order to avoid the tax obligation due as a result of the substantial income he had derived from his law practice in 1982. Petitioner's activity was limited to the signing of various agreements and transferring money to Sea Star. He made virtually no effort to increase his knowledge with respect to his investment and spent virtually no time monitoring his investment. Sea Star may have had a valid business purpose in engaging in the R&D. However, the mere presence of a valid business purpose at one level of a transaction does not automatically entitle passive investors distant *24 from day-to-day operations of the enterprise to the associated tax benefits. Beck v. Commissioner, 85 T.C. 557, 580 (1985). The activities of petitioner never surpassed those of an investor purchasing tax benefits; there is no reason to believe that the activities engaged in by petitioner are the type which Congress intended to promote through the enactment of section 174. The nature of the dealings between petitioner and Sea Star, the disparity between the purchase price and the fair market value of the property acquired by petitioner, and the illusory nature of the financing convince us that petitioner's purchase of aircraft component technology from Sea Star is devoid of economic substance. Accordingly, respondent's denial of the R&D deductions (and resulting loss) claimed by petitioner is sustained. Because we have held that the transaction was devoid of economic substance, we need not address respondent's alternate arguments. We note, however, our doubt as to the extent to which the R&D was undertaken during 1982. Additions to Tax
1. Sections 6653(a)(1) and (a)(2)
The next issue for decision is whether petitioner's underpayment of tax *25 for the year 1982 was due to negligence or intentional disregard of rules and regulations under section 6653(a). Negligence has been defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do in a similar situation. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination that the underpayment was due to negligence is presumptively correct, and petitioners bear the burden of proving otherwise by a preponderance of the evidence. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Rule 142(a). Petitioner seeks to avoid the application of the section 6653(a) additions to tax by claiming that he relied upon his accountant to accurately prepare the return. As a general rule, the duty of filing accurate returns cannot be avoided by placing the responsibility on the tax return preparer. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974); Enoch v. Commissioner, 57 T.C. 781, 802 (1972). *26 Petitioner presented insufficient evidence to show that the general rule should not apply in this case and has presented insufficient evidence to overcome the presumption of correctness attached to respondent's determination. Thus, we conclude that petitioners are liable for the additions to tax under sections 6653(a)(1) and (a)(2). 2. Section 6661
With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax on any underpayment attributable to a substantial understatement of income tax. Section 6661(b)(1) defines a substantial understatement of income tax as an understatement exceeding the greater of 10 percent of the tax required to be shown on the return for the year or $ 5,000. Petitioners clearly understated their 1982 tax liability. The correct rate of the addition to tax is 25 percent of the underpayment attributable to such understatement. Section 6661(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). However, respondent concedes that because he determined the addition to tax at a rate of 10 percent in the *27 notice of deficiency and failed to subsequently claim the addition to tax at the correct rate, if petitioners are liable for the addition to tax, it should be applied at the rate of 10 percent of the underpayment. Pursuant to section 6661(b)(2)(B) the amount of the understatement is to be reduced by the portion of the understatement which is attributable to: (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. However, special understatement reduction rules apply to tax shelters. Under section 6661, tax shelters are defined as follows: (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. Section 6661(b)(2)(C)(ii). We are satisfied that the principal purpose *28 of petitioner's investment in the Sea Star R&D program was the avoidance of Federal income tax. Our decision that such program lacked economic substance reinforces this conclusion. Because petitioner's understatement was attributable to his involvement in a tax shelter, we shall apply the special rules applicable to tax shelters in determining whether petitioners' understatement should be reduced. Where a tax shelter is involved, disclosure of relevant facts affecting an item's tax treatment does not reduce the amount of the understatement. Section 6661(b) (2)(C)(i)(I). However, the understatement is reduced if the taxpayer has substantial authority for his treatment of the item and he reasonably believes that the tax treatment of such item was more likely than not the proper treatment. Section 6661(b)(2)(C)(i)(II). Petitioners have not provided any substantial authority for their $ 121,500 R&D deduction, nor do we believe petitioners reasonably believed that their tax treatment of the item was more likely than not the proper treatment. Accordingly, respondent's determination of the section 6661 addition to tax, at a rate of 10 percent of the underpayment, is sustained. 3. *29 Section 6621(c)
The final issue for decision is whether petitioners are liable for increased interest pursuant to section 6621(c). [3]Section 6621(c) imposes interest at a rate of 120 percent of the statutory rate for substantial underpayments (defined as underpayments of at least $ 1,000) attributable to tax motivated transactions. Section 6621(c)(1). Tax motivated transactions include valuation overstatements (as defined in section 6659), as well as sham or fraudulent transactions. Sections 6621(c)(3)(A)(i) and (v). Sham or fraudulent transactions include those in which the taxpayer lacks a profit objective and which are without economic substance. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. without published opinion Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), *30 affd. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), and affd. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989). We have concluded that the transaction at issue was without economic substance; petitioners are therefore liable for the increased interest as provided in section 6621(c). To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded. ↩
2. Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. Herein, the reference to section 6621↩ is as redesignated and amended.
3. The additional interest accrues after December 31, 1984, regardless of the filing date of the returns. DeMartino v. Commissioner, 88 T.C. 583, 589↩ (1987).