**William L. ZINK and Frances P. Zink, Plaintiffs–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant.**

**No. 90–4352.**

United States Court of Appeals, Fifth Circuit.

April 3, 1991.

Ernest J. Brown, Laura M. O'Hanlon, Gary R. Allen, Ann B. Durney, William D.M. Holmes, U.S. Dept. of Justice, Tax Div., Washington, D.C., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for defendant-appellant.

William J. Friedman, Jr., H. Lee Leonard, Lafayette, La., for plaintiffs-appellees.

Before BROWN, SMITH, and WIENER, Circuit Judges.

PER CURIAM:

After Dr. William L. Zink and his wife, Frances P. Zink, plaintiffs-appellees, paid additional taxes and interest resulting from the Internal Revenue Service's (IRS) disallowance of the deductions that they claimed for research and experimentation

expenses in airplane components under section 174(a)(1) of the Internal Revenue Code, the Zinks filed a refund suit in the district court against the defendant-appellant, the United States. The district court, ruling for the Zinks, held that they were not merely investors and that their activities in connection with the airplane components were sufficiently substantial and regular to constitute a trade or business. Finding that the district court erred, we reverse.

## I.

## BACKGROUND

Dr. Zink is a surgeon who retired from his medical practice in December of 1981. His wife is a college professor who teaches elementary education. At issue in this appeal are deductions for research and experimentation expenditures claimed by taxpayers under Internal Revenue Code section 174(a) with respect to funds and the face value of promissory notes given as consideration to Tri–Liner International, Ltd. (Tri–Liner) and Sea Star Industries, Ltd. (Sea Star) in 1981 and 1982 for the development of certain component parts for two amphibian aircraft.

Lawrence Matanski is a licensed pilot involved in aircraft design. He is the president and general manager of Tri–Liner, Sea Star, and Airmaster, Inc., a subsidiary of Tri–Liner. In 1981, the Zinks entered into a purchase agreement with Tri–Liner under which Tri–Liner would perform research and development of specified component parts—the left and right wings—of a single-engine amphibian aircraft called the Avalon 680. Pursuant to this agreement, taxpayers became owners of the plans and specifications that resulted from the research and development.[1] The agreement also provided that "the rights arising from the research and development cannot readily be sold since no public market exists [and] that it may not be possible to sell or dispose of such rights." As consideration for the purchase of this research, the Zinks paid Tri–Liner $92,000 and executed a promissory note for $184,000, payable in December of 1991.

The Zinks, pursuant to the terms of the "purchase agreement," were required to enter into a separate licensing agreement. Under this licensing agreement, the Zinks granted Tri–Liner and Airmaster "a nonexclusive world-wide manufacturing right and license to use, employ and exploit all plans, specifications and technological information resulting from the research and development ... performed on behalf of [the taxpayers] ... with respect to the Aircraft Components and assemblies for purposes of ... manufacture, sale and installation of said Components." In exchange for this license, Tri–Liner and Airmaster agreed to pay taxpayers a royalty payment of $1,849 for each finished airplane ultimately sold.

In 1982, the Zinks entered into an identical agreement with Sea Star to purchase the research and development of specified component parts—the rudder parts—of a twin-engine amphibian aircraft called the Avalon "Sea Star 2." Pursuant to this purchase agreement, the Zinks were required to enter into a nonexclusive licensing agreement with Airmaster under which they would receive a royalty of $1,417 per aircraft sold. As consideration for the purchase of this research, the Zinks paid Sea Star $47,234 and executed a promissory note for $94,466 payable in December of 1992.

Both Tri–Liner and Sea Star contracted with Airmaster to perform the research and development for the investors in the Tri–Liner and Sea Star programs. Airmaster, in turn, either subcontracted this research to other entities and individuals or performed the research itself. It also maintained drawings and specifications of the various component parts developed.

In December of 1981, about one month after the Zinks entered into the Tri–Liner

---

**1.** The agreement provided in part:
Tri–Liner International, Ltd. hereby agrees that Purchaser shall have all right, title, and interest in and to all plans, specifications, and technological information resulting from the research and development (collectively "Information") perf[o]rmed on behalf of Purchaser by Tri–Liner International, Ltd.

research agreement, Tri–Liner notified the Zinks that the research and development on their wing component parts had been completed. In December of 1982, about two months after the Zinks entered into the Sea Star research agreement, the Zinks were notified that the research and development on their rudder parts was complete.

The Zinks communicated with the companies regarding the progress of the development and marketing of the airplanes. In August of 1985, the Zinks traveled to Seattle, Washington, to inspect the progress of the research and development of the planes, as well as the plant facilities where the research and development was being conducted.

To provide the needed financing to put the Avalon 680 and Sea Star 2 into production, a plan was set up to merge the research programs into a new corporation called Avalon. Corniche Resources then purchased Avalon. Participants in the Tri–Liner and Sea Star programs, including the Zinks, were offered shares of stock in the new corporation equivalent to the price paid by the participants for their research and development rights. The participants were then required to pay the balance of their Tri–Liner and Sea Star notes by returning an equivalent amount of the stock to the holder of the notes. The Zinks accepted this stock offering.

A prototype Avalon 680 aircraft was built and flight tested. The Federal Aviation Administration issued operating licenses on the Avalon 680 prototype for research and development purposes. The Avalon 680 has been the subject of various aviation magazine articles. Color brochures have been printed and distributed in an effort to market the aircraft. There are insufficient orders for the Avalon 680 single-engine plane to justify its production, but orders have been made for the Avalon Sea Star 2.

On Schedule C submitted with their 1981 and 1982 federal income tax returns, the Zinks claimed deductions for research and development in the amounts of $276,000 and $141,700, respectively. These amounts represent the total of the cash payments and the face value of the promissory notes given as consideration under the two research agreements. The IRS disallowed the Zinks' claimed research and experimentation deductions.[2]

## II.

### DISTRICT COURT PROCEEDINGS

The Zinks paid the additional $125,178 in taxes and interest resulting from the IRS's disallowance of their claimed research deductions. Thereafter, they filed a claim for refund of this amount which was denied by the IRS. The Zinks then filed the instant refund suit against the United States. The government's position was that the Zinks' research deductions were improper because (1) taxpayers were not engaged in the trade or business of developing or marketing aircraft components, and (2) taxpayers had not established that the research and development of their component parts was completed in the years for which deductions were taken.

A trial in the case was held on March 13, 1989, and March 14, 1989. Taxpayer Frances P. Zink, the taxpayers' accountant, and Lawrence Matanski, the President of Tri–Liner, Sea Star, and Airmaster, testified on the taxpayers' behalf.

At trial, Mrs. Zink testified that she and her husband looked into Tri–Liner and Sea Star programs because they wanted to *invest* a large sum of oil royalty income. She states that they chose these specific programs because they lived in an oil area and the programs related to the oil business. According to Mrs. Zink, they had never participated in this type of investment before.

Mrs. Zink admitted that prior to entering the transactions neither she nor her husband had engaged in the aircraft business. She testified expressly that she and her husband did not actually participate in the

---

**2.** After the IRS disallowed these deductions, the Zinks made two payments of $18,400 each on the Tri–Liner promissory note and two pay- ments of $9,446 each on the Sea Star promissory note. These were the only payments made on either of the promissory notes.

business and that they were not qualified to do that type of work. She also testified that she and her husband kept up with letters that they received, reports and the progress of potential sales, and the locations where the plane would be exhibited—information that came to them by virtue of the companies' mailing lists. She also testified that they visited the plant in Seattle, saw the plane and the prototype, and went to an exhibit of the plane in Louisiana. Although Mrs. Zink testified that they saw the plans, drafts, and blue prints of their plane components on their Seattle visit, she admitted that she "didn't have the professional knowledge" to know what she was looking at. She also acknowledges that although the parts were labelled on these documents, they could not identify their parts of the airplane on the documents.

Mrs. Zink further testified that they never received any royalty payments or income from the programs and that they subsequently exchanged their royalty rights and the research agreement to Avalon, Inc. for stock, which they used to pay off their outstanding promissory notes with Tri–Liner and Sea Star. Mrs. Zink also testified that, before entering into this stock agreement, they made no effort to sell either the research and development or the aircraft components.

Lawrence Matanski testified that he never met the taxpayers until after the airplane flew and that he had shown them the plant and the facility on their trip to Seattle. He also testified that after Dr. Zink signed the research agreements in 1981 and 1982, the Zinks never gave him instructions of any kind.

Matanski further testified that the corporate purposes of Sea Star and Tri–Liner were to raise money and sell the aircraft as opposed to doing the actual work on the aircraft. He also acknowledged that the promissory notes used to finance a large portion of the Tri–Liner and Sea Star transactions were used to "give ... incentive to *investors* that don't understand that much about aircraft and the risk involved other than that they do crash and burn once in a while." Matanski also testified that each aircraft was broken into about 74 component parts to be sold to *investors* and that the component parts were not interchangeable with other aircraft.

The Zinks' accountant testified that he showed the Zinks investments in paper pulping, oil drilling, and real estate, in addition to the subject aircraft. He also testified that the Zinks had no business activities regarding the aircraft components in Louisiana. He also confirmed that the entire aircraft would have to be manufactured before the component parts have any value.

The district court held that the Zinks were entitled to their claimed research and experimentation deductions. The court found that the taxpayers invested in the programs in a businesslike manner with the intention of making a profit. The court also held that the taxpayers' activities in connection with the programs were "sufficiently substantial and regular to constitute a business."

The district court initially entered its opinion and judgment on December 18, 1989 (the "December Judgment"). On January 12, 1990, the district court entered a minute order which removed from the record and placed under seal its December 18, 1989, opinion and judgment. A "Substituted Opinion" and a "Substituted Judgment" were entered by the court on January 11, 1990, (the "January Judgment") and January 12, 1990, respectively. The January Judgment provided as follows:

> IT IS ORDERED, ADJUDGED AND DECREED that judgment is hereby GRANTED to the plaintiffs, William L. Zink and Frances P. Zink against the defendant, United States of America, and that the defendant shall pay all costs of this action.

Neither the December Judgment nor the January Judgment was labeled "final judgment." Both, however, failed to reflect the amount of the refund due the Zinks. And neither of the opinions accompanying the December and January Judgments reflects a dollar amount.

The government, pursuant to a letter dated March 7, 1990, advised the district

court "that a final judgment should now be entered specifying the amount plaintiffs are entitled to recover in this action, which would be the amount sought by their complaint of $125,602, plus interest provided by law, and costs of $60." On March 12, 1990, the district court entered a judgment (the "March Judgment") which provided:

IT IS ORDERED, ADJUDGED AND DECREED that judgment is granted to the plaintiffs, William L. Zink and Frances P. Zink, against the defendant, United States of America, in the amount of $125,602, plus interest as provided by law, and that the defendant shall pay costs in this action in the amount of $60.

On May 9, 1990, more than 60 days from the entry of the December 18, 1989, and January 11, 1990 judgments, but within 60 days of the March 12, 1990 revised judgment, the government filed a notice of appeal.

## III.

## DISCUSSION

### A. Appellate Jurisdiction

■■■■ On appeal, this court raised the issue whether the government timely appealed. This issue turns on which of the district court's judgments was final.

When the government is a party, Rule 4(a)(1) of the Federal Rules of Appellate Procedure requires an appellant to file a notice of appeal within 60 days of the entry of the judgment by the district court. "A judgment is 'final' when it terminates litigation on the merits and leaves the court with nothing to do except execute the judgment." *Offshore Prod. Contractors Ins. Co. v. Republic Underwriters*, 910 F.2d 224, 229 (5th Cir.1990) (citing *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)). "The mere fact that a court reenters a judgment or revises a judgment in an immaterial way does not affect the time within which a litigant must pursue an appeal. Rather, the test is 'whether the lower court, in its second order, has disturbed or revised legal rights and obligations which, by its prior judgment, had been plainly and properly

settled with finality.' " *Id.* (quoting *FTC v. Minneapolis–Honeywell Regulator Co.*, 344 U.S. 206, 211–12, 73 S.Ct. 245, 248–49, 97 L.Ed. 245 (1952)).

The government argues that the January Judgment was plainly not a final judgment, which fully adjudicates the rights and responsibilities of the parties, because that judgment failed to specify the amount of the tax refund to be awarded the taxpayers.

The Zinks argue that the December and January Judgments terminated the litigation on the merits and that the revision made by the March Judgment was immaterial because the *amount* of the refund was not controverted and because it was clear from the December and January judgments that the Zinks had won 100% of their tax refund claim.

Although "there is no statute or rule that specifies the essential elements of a final judgment and [the Supreme] Court has held that '[n]o form of words and no peculiar formal act is necessary to evince [the] rendition [of a judgment],' " *United States v. F. & M. Schaefer Brewing Co.*, 356 U.S. 227, 233, 78 S.Ct. 674, 678, 2 L.Ed.2d 721, 726–27 (1958) (quoting *United States v. Hark*, 320 U.S. 531, 534, 64 S.Ct. 359, 361, 88 L.Ed. 290 (1944)), "a final judgment for money must, at least, determine, or specify the means for determining, the amount" of the judgment, *id.* at 233–34, 78 S.Ct. at 678, 2 L.Ed.2d at 727.

Because the December and January Judgments did not specify the amount of the judgment, neither of those judgments was final. We find that the March Judgment was the final judgment from which the government timely appealed.

### B. Deductions

1. Standard of Review

■■■ Whether the Zinks' investment was in their own "trade or business" is a question that involves the application of law to facts. "[W]e review the [district] court's factual findings, including reasonable inferences that may be drawn therefrom, under the clearly erroneous standard, but review

de novo the application of the law to those facts." *Jackson v. Commissioner*, 864 F.2d 1521, 1524 (10th Cir.1989) (citations omitted); *see also Wilson v. United States*, 179 Ct.Cl. 725, 376 F.2d 280, 293 (1967) (Whether investment expenses are within the scope of section 162(a), which authorizes deductions for expenses incurred in carrying on any trade or business, is a question of law.). *But cf. Crosby v. United States*, 414 F.2d 822, 826 (5th Cir.1969) (noting that the proper classification of an asset is essentially a question of fact reviewed for clear error).

### 2. "Trade or Business"

Section 174(a)(1) of the Internal Revenue Code provides that "research or experimental expenditures which are paid or incurred by [a taxpayer] during the taxable year in connection with his trade or business" may, at the taxpayer's election, be deducted currently rather than capitalized. To qualify for a deduction under section 174, however, the expense must arise in connection with a "trade or business" *of the taxpayer. See Levin v. Commissioner*, 832 F.2d 403, 405 (7th Cir.1987); *Independent Elec. Supply, Inc. v. Commissioner*, 781 F.2d 724, 726 (9th Cir.1986). The provisions of section 174 "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to research or experimentation carried on in his behalf by another person or organization." Treas.Reg. § 1.174–2(a)(2). Although the applicable regulation "permits the deduction when the taxpayer has contracted with someone else to do the work on the taxpayer's behalf," "the taxpayer itself must be engaged in the trade or business" and "[t]he work must be done for the taxpayer, not for some other entity." *Property Growth Co. v. Commissioner*, 55 T.C.M. (CCH) 1072 (1988), *aff'd*, 889 F.2d 1090 (8th Cir.1989).

In *Snow v. Commissioner*, the Supreme Court established that deductions under section 174 could be claimed in connection with a trade or business even though the taxpayer was not currently producing or selling any product. 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974); *see Green*

*v. Commissioner*, 83 T.C. 667, 686 (1984); *see also Levin v. Commissioner*, 832 F.2d 403, 405 (7th Cir.1987) (Section 174 "allows deduction to start-up firms no less than to established firms"). For section 174 to apply, however, "the taxpayer must still be engaged in a trade or business at some time, and [the district court] must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business." *Green*, 83 T.C. at 686–87.

The *management* of investments, however, is not a trade or business, regardless of how extensive or complex the investment portfolio or how much time is required to manage such investments. *Higgins v. Commissioner*, 312 U.S. 212, 218, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941); *see Whipple v. Commissioner*, 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963); *Spellman v. Commissioner*, 845 F.2d 148, 150 (7th Cir.1988); *Green*, 83 T.C. at 688–89. The courts, accordingly, have scrutinized claimed research and development expenditures to sort out legitimate expenditures from those designed to shelter the income of passive investors. *See, e.g., Spellman*, 845 F.2d at 151; *Diamond v. Commissioner*, 92 T.C. 423 (1989).

In determining whether research and development expenditures were incurred in connection with a trade or business of the taxpayer, the courts have considered a two-step inquiry: (1) whether the taxpayer had the requisite profit motive in undertaking the activity; and (2) whether the taxpayer's activities in connection with the venture were sufficiently substantial and regular to constitute a trade or business. *See Diamond*, 92 T.C. at 437, 443. Obviously, establishment of the requisite profit motive alone does not satisfy section 174. *See Green*, 83 T.C. at 687 ("Commissioner concession that [taxpayer's] activities were profit motivated establishes only the first step of our inquiry [and] we still must decide whether those activities were such as to constitute a regular trade or business."); *see also Snyder v. United*

*States*, 674 F.2d 1359, 1364 (10th Cir.1982) ("Even where the taxpayer engages in the activity primarily for profit, such activity does not automatically constitute a 'trade or business' under section 162.").

■ In this case, the government does not challenge the district court's finding that the Zinks had the requisite profit motive. Instead, the government argues that the district court erred in concluding that the Zinks' activities in connection with the product were sufficiently substantial and regular to constitute a trade or business. We agree with the government that the Zinks' activities in connection with these products never surpassed those of investors and that the district court erred in allowing them to deduct the cost of their investment under section 174.

The Zinks assert that the Tri–Liner and Sea Star programs were valid business enterprises. But, as the government notes, that the development or marketing of aircraft or its components is the Zinks' own trade or business does not follow from the fact that the programs were valid business enterprises. Another court has addressed whether a different investor in the 1982 Sea Star program was engaged in the same trade or business as Sea Star. *Hattier v. Commissioner*, 58 T.C.M. (CCH) 1109 (1990). In rejecting the same argument made by the taxpayer in that case, the court noted:

> Sea Star may have had a valid business purpose in engaging in the R & D. However, the mere presence of a valid business purpose at one level of a transaction does not automatically entitle passive investors distant from day-to-day operations of the enterprise to the associated tax benefits.... The activities of [the taxpayer] never surpassed those of an investor purchasing tax benefits [and] there is no reason to believe that the activities engaged in by petitioner are the type which Congress intended to promote through the enactment of section 174.

*Id.* We agree with the government that the activities of the Zinks, receiving reports, keeping up with the progress of the project, visiting the plant on one occasion, and attending an exhibition of the aircraft in their hometown, indicate nothing more than that they were interested investors keeping up with the progress of their investment. These activities are insufficient, *as a matter of law*, to establish that the Zinks were in that trade or business for the purposes of section 174. *See Higgins*, 312 U.S. at 218, 61 S.Ct. at 478 (holding that taxpayer's activities of keeping records and collecting interest and dividends from his securities, regardless of the size of the estate and the amount of managerial attention required, were insufficient as a matter of law to constitute a trade or business); *Spellman*, 845 F.2d at 151 (holding that the right to monitor the company's use of money and the receipt of written reports were insufficient to put the taxpayer in that trade or business). Everything that the Zinks did was wholly consistent with investor activity, not the activity of one engaged in an active trade or business.

In this case, the taxpayers presented no evidence that they participated in the actual activities of developing or marketing aircraft components or that they exercised any control over those activities other than the right to yank their investment. Mrs. Zink testified that they did not participate in the business of Tri–Liner or Sea Star at all and that they never engaged in any business other than Dr. Zink's practice of medicine, her job as an elementary education professor, and the rental of their farm. She also testified that once they paid the fixed price under the Sea Star and Tri–Liner agreements, they were not concerned with how money was spent or how the research and development were performed because they were not knowledgeable enough to make that judgment. Similarly, the chief inventor, developer, and president of the companies testified that the Zinks neither asked for, nor gave, any instruction regarding the project, and that his only contact with the taxpayers consisted of showing them around the plant when they visited Seattle in 1985. The lack of control over the activities in which they invested leads to the conclusion that the taxpayers were merely investors and were

not engaged in that trade or business. *Diamond*, 92 T.C. at 443.

In distinguishing a mere passive investor from an individual who incurs research expenditures in connection with his trade or business, courts have held that "the controlling inquiry under section 174 is whether, during the years in issue, there was any 'realistic prospect' that the [taxpayer] in question would enter a 'trade or business' involving the technology being developed." *Hattier*, 58 T.C.M. (CCH) at 1109. "If such prospects are not realistic, the [taxpayer] should be treated as no more than a passive investor or financing vehicle—not eligible for deductions under section 174." *Id.* As the Seventh Circuit explained in *Levin v. Commissioner*, the proper inquiry is "whether the [taxpayers] reasonably anticipated availing themselves of the privileges they possessed on paper." 832 F.2d at 406; *see also Spellman*, 845 F.2d at 149 ("[I]t [is] important to determine whether the prospects for developing a new product that will be exploited in a business of the taxpayer are realistic.... If those prospects are not realistic, the expenditure cannot be 'in connection with' a business of the taxpayer."). That the Zinks possessed the legal entitlement to go into the airplane business is not dispositive. *Levin*, 832 F.2d at 407 ("[L]egal entitlements, divorced from economic incentives and business probabilities, are not enough" to establish that the taxpayer was in the trade or business in which he invested.). Neither is the fact that the Zinks' agreements with the prospective manufacturers of the aircraft purported to be "nonexclusive." Such a boilerplate provision is not determinative when, as here, it is totally lacking in commercial reality.

In this case, the district court erred in determining that the Zinks were in the trade or business in which they invested. The evidence of the Zinks' involvement with the airplane business was insufficient as a matter of law to establish that they were engaged in the airplane business or trade. Moreover, the taxpayers presented no evidence that any realistic prospect existed that they would enter a trade or business involving the development of aircraft components.[3] Therefore, we find that the Zinks' alleged "research expenditures" were not within the ambit of expenditures qualifying for a deduction under section 174.

For the foregoing reasons, we REVERSE the judgment of the district court in favor of the Zinks, and RENDER judgment for the United States.

---

**3.** Under the research agreements, the Zinks owned the research and development with respect to their particular component parts and granted a nonexclusive license to Tri–Liner and Sea Star to utilize the information or grant another license. Because the component parts in which the Zinks invested were not capable of being used interchangably on other aircraft, the research and development information pertaining to any single component part was useless by itself.