T.C. Memo. 1996-122

UNITED STATES TAX COURT

INVESTMENT ENGINEERS, LTD., ROBERT S. McGLAMERY,
A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9300-92.                     Filed March 12, 1996.

Robert S. McGlamery, pro se.

Robert L. Montelius, Jr., tax matters partner, pro se.

<u>Sherri L. Munnerlyn</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  In a Notice of Final Partnership
Administrative Adjustment (FPAA) sent December 3, 1991,
respondent increased the income of Investment Engineers, Ltd.
(the partnership), by $540,500 for 1982, $218,000 for 1983, and

$123,000 for 1984. In <u>Investment Engineers, Ltd. v.</u> <u>Commissioner</u>, T.C. Memo. 1994-255, we concluded that the statute of limitations did not bar assessments pursuant to the FPAA. Remaining for decision is whether the partnership is entitled to deductions claimed under section 174 in the amounts adjusted by respondent. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The history of management of the partnership is set forth in T.C. Memo. 1994-255. Subsequent to that opinion, respondent filed a Motion to Appoint a Tax Matters Partner. Robert L. Montelius, Jr. (Montelius), was appointed tax matters partner solely for the purpose of these proceedings.

The partnership was formed in December 1982. The promoter of the partnership was Gregory A. Knox (Knox). Knox had a juris doctor degree, but was not admitted to any bar, and made his living as a financial planner.

The partnership was created by a Limited Partnership Agreement dated December 14, 1982. The stated purpose of the partnership was to engage in the business of research and experimentation for the development of computer software in the

field of financial planning.  The partnership agreement stated "a partnership unit" represented a capital contribution of $5,000 to the partnership.  After identifying the initial general partner and one limited partner, the agreement provided in part:

> Each additional person who (not to exceed thirty four (34) in total, with spouses, and other close, family related multiple investors counting together as one investor) acquires any such Partnership Units shall be eligible to become a Limited Partner in the Partnership at such time as he has:

> (1) Purchased three or more Partnership Units,

> (2) Contributed the sum of $5,000 cash and/or notes for each Partnership Unit purchased,

In a Certificate of Limited Partnership executed December 15, 1982, Timothy J. Curtis, the initial general partner, and Debra Lee Jensen (Ms. Jensen), the initial limited partner, stated that Ms. Jensen had contributed cash of $83.33 and a note for $416.67 to the partnership.

In an Amendment to Certificate of Limited Partnership of Investment Engineers, executed December 30, 1983, the cash and other property contributed by the limited partners were listed. According to that certificate, as of December 30, 1983, eight limited partners had contributed cash in the amount of $100 each and notes in amounts varying from $9,900 to $59,900.  Two limited partners had contributed $500 in cash each and notes of $14,500 and $34,500.  Montelius contributed $110 cash and notes totaling $79,890.  Robert S. McGlamery contributed cash of $4,010 and

notes totaling $159,990. Two other limited partners contributed cash of $2,500 and $4,000 and notes of $12,500 and $20,000, respectively.

The notes executed by the limited partners were due over a period of approximately 11 years, with the first payment due on May 1 of the year following the date on which the note was executed and with additional annual payments commencing on December 1 of the fifth year after the note was executed.

In the prospectus for the partnership, the benefits to the limited partners were described as follows:

(1) **6:1 Write Off -** An investor may be able to deduct from his taxable income in 198_ six times the amount of his cash contribution made during the first year of partnership operations.

(2) **Capital Gains Treatment of Profits -** Investors may only have to report 40% of profits from the partnership in their taxable incomes.

(3) **High Profit Potential -** If 4,100 customers are obtained by year 5, and retained at a royalty of $250 per year to the partnership, each investor can expect an average annual after tax return of up to 45% of his initial investment.

Nothing in the prospectus described how the software to be developed by the partnership would be manufactured, distributed, or marketed. Under the heading "Risk Factors", the prospectus stated, in part, the following:

The proposed researchers appear to have the skills, experience and commitment to produce the product ordered by the partnership. However, in the Investment Engineers, LTD. project, there are no funds, neither can there be funds (without loss of tax

benefits) for marketing.  Thus, even should a successful product be delivered to the Partnership, it would take a marketing company [to] make the partnership successful. * * *

On December 31, 1982, a Research Agreement between Knox and the partnership was executed.  The partnership agreed to pay to Knox a flat fee $600,500.  Article I of the Research Agreement specified the scope and definition of work as follows:

> Knox will carry on research and development work at the order and risk of the Partnership on a research program to develop new and unique computer software in the field of financial planning.  It is understood that this software will cause computers to perform financial planning tasks in contrast with other such software, and/or real doubt exists as to the operational feasibility of developing the software.  The proposed software should perform, at a minimum, the following functions:
>
> A.  Convert the essential factors of qualitatively "unlike" investments, including stocks, real estate, fixed-interest investments (bonds, etc.), gold, foreign currencies, silver, commodities, collectables, etc., to a common "investment language" so that they can be analyzed, compared, and contrasted as though they were qualitatively identical;
>
> B.  Allow the software user to imput [sic] the dissimilar investments, and receive back either the computer's translation into its own "language", or an analysis of the dissimilar investments which will allow the user to analyze them as though they were qualitatively similar; being then dissimilar only quantitatively;
>
> C.  Cross reference, between apparently dissimilar investment choices, areas that are actually similar, such as where--
>
> > 1.  Two investments are similar because they both are "leveraged", such as real estate and commodities, or

    2.  Multiple investment media are actually different ways of owning the same underlying entity, such as gold versus gold stocks versus gold commodity futures.

    D.  Allow user to imput [sic] current cyclical and technical indicators, or experiment with any possible indicators, and show their historical effect on any particular investment, group of investments, or portfolio combinations.

    E.  As to various types of investments, assuming consistent quality among them, the user will be able to design investment strategies to maximize the goals of a particular client presenting a specific factual situation, according to either historical performance of the investments involved and the cyclical and technical indicators imputed, or, according to the users own theories and strategies.

    F.  The software will have a built in strategy for preservation of capital in the face of disasters of either deflation or runaway inflation, as well as beating inflation in current circumstances.

On December 30, 1983, the partnership and Knox executed an Amendment to Research Contract. Under the amendment, the partnership agreed that Knox would not perform, as part of the consideration under the original Research Agreement, item F, quoted above, and Knox agreed to a reduced fee of $540,500 for the other work to be performed under the original Research Agreement. In addition, Knox agreed to perform item F above and two new items for a flat fee of $218,000. The new items were set forth as follows:

    G.  Knox will attempt to make the software perform as a type of "Video Game" that will allow the user to take various roles, such as government, investor, and voter, to teach and illustrate cause and effect relationships between various dependent and independent

variables in an economy, and how such relationships may affect investment prices.

    H.  Knox will attempt to make the software include an effective "Sales" type approach which will allow a user who is a financial planner to introduce the software's (and his) abilities to a prospective client, who must be "sold" in a very short presentation.

On July 9, 1984, the partnership and Knox executed another Amendment to Research Contract.  For an additional flat fee of $241,500, Knox agreed to additional tasks specified as follows:

    I.  Knox will attempt to adapt the latest techniques of educational psychology to make the software a powerful teaching tool, to train the user in each area of planning covered by the Research Agreement.  This training and teaching does not apply to computer or software program use, but to financial planning itself.  Thus, it is hoped that the software will teach financial planning as well as do financial planning, both using software techniques which are new and unique.

    J.  Knox will attempt to make the software, in its functions as a planning, teaching, and sales tool adaptable to the various primary distributors of financial planning, such as banks, life insurance companies, and securities brokers, so that their particular products are emphasized and highlighted.

On November 29, 1987, the partnership and Knox executed another Amendment to Research Agreement.  That amendment stated in part:

    Whereas, Gregory A. Knox having agreed to do research over an eleven year period, at the order and specification of the partnership in exchange for certain sums, to be paid entirely at the risk of the partnership, and, such payments have been facilitated by the previous assignment of partnership receivables in the form of notes, the parties to such Research Agreement hereby amend it according to the following considerations:

I.   Inasmuch as Knox has substantially exceeded original projections of the time in which a marketable product was to be delivered to the Partnership, and, while acknowledging that he made no warranties, other than to perform in good faith, as to the fruits of his efforts, he acknowledges his imput [sic] into the projections which comprised a pertinent part of the offering materials.

II.   The Partnership acknowledges dramatic changes in political, economic and engineering environments which have all impacted the progress of the research contemplated by the Research Agreements, and, certifies that Knox has thus far performed his duties in good faith.  (Substantial progress having been made toward all research goals).

III.   Knox hereby makes the following concessions:

(a) To forgive all interest due on all Partnership Notes assigned to him as payment for the Research Agreements; (except those that have been sold, optioned, or borrowed against) acknowledging that interest was charged in the first place in light of anticipated high, "1970's" inflation rates, which have not materialized.

(b) To push back the due dates of said Notes until either December 1, 1994, (approximately one year after the conclusion of the original research agreement), or, one year after a completed product is delivered to the Partnership, whichever occurs first.  Payments on the Notes are to be made over the same number of annual installments as stated therein, and the amount of each installment shall be the remaining balance on the Note, less interest, divided by the number of payments stated.

Knox determined the amounts of compensation that he was to receive for his services under the Research Agreement.

No companies were organized or contacted to market any potential products created under the Research Agreement, and the partnership did not enter into any contracts with third parties

regarding the marketing of any potential product created pursuant to the Research Agreement.  There was no funding within the partnership for the marketing of any computer software product that might have been produced, and no marketing occurred.

Knox never provided the partnership with the completed computer software product.  The partnership never maintained any office.  The partnership never operated a trade or business.  The partnership received no income from sales of computer software.

During the years in issue, Knox wrote checks to various partners and related persons and entities for "research" or "consulting".  For 1982, the partnership sent a Form 1099-MISC to Knox, reporting $4,000 paid for research.  Knox sent a Form 1099-MISC to Montelius, reporting $500 paid for research.

For 1983, the partnership sent a Form 1099-MISC to Knox, reporting $71,136 paid for research, and Knox sent Forms 1099-MISC to Montelius and to Michael V. Jensen (Jensen), reporting $17,804 and $17,691, respectively.  For 1984, the partnership sent to Knox a Form 1099-MISC, reporting payment of $29,450.  Knox issued Forms 1099-MISC to Wayne E. Brickey for $5,453, Montelius for $6,000, and Jensen for $7,374.

In an undated report to limited partners, the following accounting summary was set forth:

A.  1983 (& before) Commitments -   $26,000
B.  1983, etc. receipts -           $10,333
C.  1983, etc. still owed -         $12,667

D.  1984  Commitments -             $20,500
E.  1984  Receipts -                 $4,000
F.  1984  still owed -              $16,500

Note:  Principals will finish for above cash, or unsold Partnership equity, or a combination thereof.

G.  Raisable funds - 1985           $48,647
H.  1984 Expenditures
    1.  Greg Knox - Lab Research    $8,733 (+1890)
    2.  Wayne Brickey - Lab Research - $5,600
    3.  Mike Jensen  $7,374  [illegible]
    4.  Robert L. Montelius $6,700  programming
          for John

On U.S. Partnership Returns of Income, Forms 1065, filed for 1982, 1983, and 1984, the partnership reported as "Cost of goods sold and/or operations" the amounts of $540,500, $218,000, and $123,000, respectively.  The amounts were claimed to be "cost of labor" on the partnership returns.  The balance sheets on the returns reflected the following balances:

|  | 1982 | 1983 | 1984 |
|---|---|---|---|
| Cash | $ 5,057 | $ 14,912 | $ 1,426 |
| Other current assets-- notes receivable | 85,860 | 19,723 | 14,500 |
| Other assets-- notes receivable | 454,583 | 175,833 | 102,500 |
| Total assets | $545,500 | $210,468 | $118,426 |
| | | | |
| Accounts payable | $540,500 | $205,468 | $113,426 |
| Partners' capital accounts | 5,000 | 5,000 | 5,000 |
| Total liabilities and capital | $545,500 | $210,468 | $118,426 |

Respondent disallowed the deductions claimed for costs of goods sold on each of the returns in issue, with the following explanation:

It is determined that the losses reported on your 1982, 1983, and 1984 schedule K, Form 1065, U.S. Partnership Return of Income are disallowed for the alternative reasons listed below:

1.   It has not been established that the partnership is engaged in a trade or business or that the partnership engaged in the activity with the primary purpose of making a profit.

2.   It has not been established that the claimed deductions represent an expenditure for a related [sic] to research and development actually undertaken.

3.   It has not been established that the amounts proven to be expended, if any, in relation to alleged research and development are currently deductible, and are not capital expenditures.

4.   It has not been established that you had any amount at risk, as defined by section 465 of the Internal Revenue Code.

5.   It has not been established that the purported transactions contained any economic reality or substance.

In 1995, in relation to settlement negotiations with respondent's Appeals Division, Montelius created diskettes supposedly demonstrating the software produced under the Research Agreement.

## ULTIMATE FINDINGS OF FACT

The research activities of the partnership lacked economic substance.  The partnership did not engage in any activity for

the primary purpose of or with an actual and honest objective of making a profit. The partnership had neither the objective intent nor the capability of entering into a computer software business.

## OPINION

Petitioner has the burden of proving that respondent's determination is erroneous. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975), affg. T.C. Memo. 1972-133. Petitioner contends that, even though the partnership was never in a trade or business, it is entitled to deduct research expenses under section 174. Section 174(a)(1) provides:

> (1) In general.--A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

The language "in connection with * * * [the taxpayer's] trade or business" has been interpreted to allow deduction of research expenses in a business that is only prospective. Snow v. Commissioner, 416 U.S. 500 (1974). In Kantor v. Commissioner, 998 F.2d 1514, 1518-1519 (9th Cir. 1993), affg. T.C. Memo. 1990-380, the Court of Appeals for the Ninth Circuit stated:

> Although a taxpayer need not be conducting a trade or business at the time it incurs the research expenditure, the taxpayer must demonstrate a "realistic prospect" of subsequently entering its own business in connection with the fruits of the research, assuming

that the research is successful.  See Zink v. United States, 929 F.2d 1015, 1023 (5th Cir. 1991); Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988).  We hold that a taxpayer demonstrates such a prospect by manifesting both the objective intent to enter such a business and the capability of doing so.  See Spellman, 845 F.2d at 150-51; Levin v. Commissioner, 832 F.2d 403, 406-07 (7th Cir. 1987); see also United Fibertech, Ltd. v. Commissioner, 976 F.2d 445, 446 (8th Cir. 1992) (per curiam); Diamond v. Commissioner, 930 F.2d 372, 375 (4th Cir. 1991).

In Kantor v. Commissioner, supra, the Court of Appeals for the Ninth Circuit affirmed our conclusion that the partnership involved there had no realistic prospect of engaging in its own trade or business in connection with the development of software at the time it incurred the research expenditures in dispute. The Court of Appeals agreed that the evidence in that case established that the partnership "had neither the objective intent nor the capability of entering such a business."  Id. at 1519.  We reach the same conclusion here.

In Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987), the Supreme Court reviewed prior cases, including Snow v. Commissioner, supra, and stated that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit.  A sporadic activity, a hobby, or an amusement diversion does not qualify."  It is established that tax deductions cannot be based on "the expedient of drawing up papers to characterize the transactions in question as something contrary to the

economic realities thereof, solely to obtain unallowable tax benefits." <u>Falsetti v. Commissioner</u>, 85 T.C. 332, 355 (1985). We conclude here that the partnership lacked the required profit objective and that the partnership activity had no substance beyond the attempted creation of tax benefits.

Nothing in the record of this case explains who did what and when to justify the deductions totaling $881,500 over a 3-year period. It cannot be determined reliably from the record how much cash actually changed hands, because the exhibits reflect inconsistent representations by the partnership. The contributions reported on the limited partnership certificates do not reconcile with the terms of the partnership agreement. The Forms 1099-MISC submitted to the Internal Revenue Service do not reconcile with the reports to the partners. Payments in evidence primarily went from the partnership to Knox and back to the partners. The cash payments are a small fraction of the deductions claimed. The size of the payments belies the allegation that much work was actually performed. The only indication that anything tangible was done are the diskettes produced by Montelius in 1995 expressly for the purpose of being presented to the Appeals Division in an attempt to settle this case.

By contrast, the record contains various exhibits and testimony suggesting that the partnership's primary purpose was to promote the political and economic views of Knox and,

acccordingly, to deny tax revenues to the Federal Government.

Petitioner's trial memorandum states, in part:

> the product sought to be developed by the partnership here dealt simultaneously with politically driven investment economics, and the computer software and hardware industries which both underwent watershed revolutions in the years since the product development began. In spite of delays, the product has been managed to professional engineering specifications, and, a working prototype thereof attempts to solve at a personal level what at this moment is the biggest political issue of all, how to deal with government's relationship with the economy without depending on the politicians, who may not be able to perform.

Knox testified:

> Q. Could you explain to us how * * * [the computer software] was supposed to work?

> A. I had a background in political science and financial planning, as well as law, and I had worked as a financial planning rather--planner rather than as a lawyer. And I was interested in the nexus between government action and economics and investments, and I had studied the--I'd done some reading and studying in the--I'd become converted to some economic philosophies that are founded in what's called the Austrian School of Economics, and became convinced that the government deficit and spending problem was out of control at that time and would eventually wreak serious consequences on the economy, and that there existed investment strategies that individuals could use to counter coming distortions or upheavals that would affect their investment portfolios.

> Q. So what was the purpose of this product?

> A. The purpose of the product was to give people--the purpose of the product was to discover and apply proprietary ways of measuring governmental and political influence on the economy and use these measurements to develop investment strategies that would be used through the--through computer software, so that people could use the computer software to design investment strategies to counter political and governmental influences in the economy.

Neither Knox nor anyone else provided any specific explanation, examples, or research product that showed how the product would or could work, or how the research would lead to an actual business activity. Petitioner and Knox merely offered hearsay materials that allegedly corroborated their view of the problems in the national economy.

Petitioner introduced expert testimony and a report that analyzed the diskettes created in 1995. The expert report specifically stated, however, that the expert was not an economist and did not "fully understand the economic projections and usefulness of the goals of this software and furthermore cannot comment on the algorithms used in the software."

The record is devoid of any plan for production of the software for sale to the public, and petitioner stipulated to the absence of arrangements for marketing any product. Knox and Montelius made a few self-serving reports to investors, some of which were prepared after audit of the partnership's returns commenced, but the reports are not corroborated by any nonhearsay evidence, and they lack credibility.

The record supports various inferences about the tax-avoidance purpose of the partnership and the motivation of Knox and the other partners; it negates economic substance or profit objective. The evidence does not support a finding that the partnership had either the objective intent or the capability of entering into any business. Petitioner has failed to satisfy

his burden of proving that respondent's determination is erroneous in any respect.  Upon due consideration of the entire record,

<u>Decision will be entered</u>

<u>for respondent</u>.