T.C. Memo. 1997-504


UNITED STATES TAX COURT


CACTUS WREN JOJOBA, LTD., CECIL R. ALMAND,
TAX MATTERS PARTNER,[1] Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


YUMA MESA JOJOBA, LTD., WILLIAM WOODBURN,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14505-87, 25138-87.    Filed November 10, 1997.


Frederick R. Schumacher, for petitioners.

Rodney J. Bartlett and Brian M. Harrington, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section

_____

[1]    These cases are consolidated herewith for purposes of trial, briefing, and opinion.

7443A(b)(4) and Rules 180, 181, and 183.[2]  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  Cactus Wren Jojoba, Ltd. (Cactus Wren) is a Texas limited partnership to which the provisions of sections 6221-6233 (the TEFRA partnership provisions)[3] are applicable.  By notice of final partnership administrative adjustment (FPAA) respondent determined the following adjustments to the partnership return of income of Cactus Wren for the taxable year 1983:  (1) Disallowance of $164,057 claimed as qualified research and development expenditures under section 174; and (2) disallowance of $10,500 claimed as a deduction for tax counseling fees.  Respondent also determined that, in the alternative, if the research and experimentation expenditure were allowed as a deduction, it would be an item of tax preference under section 57(a)(6).  Cecil R. Almand (Almand), as tax matters partner (TMP), timely filed a petition with this Court.

---

[2]    All section references are to the Internal Revenue Code in effect for the tax years in issue, except as otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]    The so-called TEFRA partnership provisions, secs. 6221-6233, were added to the Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648.

Yuma Mesa Jojoba, Ltd. (Yuma Mesa), is a Texas limited partnership to which the TEFRA partnership provisions are applicable. By notice of FPAA respondent determined the following adjustments to the partnership return of income of Yuma Mesa for the taxable year 1982: (1) Disallowance of $1,298,031 claimed as qualified research and experimental expenditures under section 174; (2) disallowance of $9,000 claimed as a deduction for tax counseling fees; and (3) disallowance of $750 claimed as a deduction for guaranteed payments to partners. Respondent also determined in the alternative that, if the research and experimentation expenditure were allowed as a deduction, it would be an item of tax preference under section 57(a)(6). William Woodburn (Woodburn), as TMP, timely filed a petition with this Court.

The issue remaining for decision is whether the Yuma Mesa and Cactus Wren partnerships are entitled to losses for the taxable years 1982 and 1983, respectively, resulting from claimed deductions attributed to research and development expenses. In their opening brief, petitioners make an alternative argument that the partnerships are entitled to an abandonment loss under section 165 for 1987. The 1987 tax year is not before the Court with respect to these consolidated cases, and therefore we decline to address this issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The jojoba plant is a shrub that is native to the Sonora Desert region in Arizona, California, and Mexico. A jojoba plant may live more than 100 years. The female jojoba plant produces a seed, sometimes referred to as a bean, that contains approximately 50 percent by weight of an unusual oil. Jojoba oil is actually a liquid wax ester, unlike the triglyceride oils typically produced by plants, and is similar to sperm whale oil.

It takes 5 years or more for a jojoba plant to produce seeds in a harvestable quantity. Approximately 20 pounds of jojoba seeds are needed to produce 1 gallon of jojoba oil. Jojoba oil is useful for a variety of purposes, ranging from cosmetics and shampoos to industrial lubricants.

The ban in 1971 on the importation of sperm whale oil and products using that oil stimulated an interest in the commercial production of jojoba oil. During the 1970's and the early 1980's, jojoba oil was available only from native jojoba plants. At that time in the United States, there were only a few commercial-size jojoba plantations, all of which were in developmental stages. Domestication studies were being conducted in the United States during that time at the University of California at Riverside and the University of Arizona, among

other places.

Yuma Mesa entered into an agreement with Hilltop
Plantations, Inc., to provide agricultural research and
development services with respect to the growing of jojoba on
land in Yuma, Arizona (plantation I).  Cactus Wren entered into
an agreement with Mockingbird Plantations, Inc., to provide
agricultural research and development services with respect to
the growing of jojoba on land in Yuma, Arizona (plantation II),
adjacent to plantation I.  The ownership of Hilltop Plantations,
Inc., and Mockingbird Plantations, Inc., is identical.  Neither
Yuma Mesa nor Cactus Wren engaged in any activity other than to
enter into agreements described herein and transmit payments to
Hilltop Plantations, Inc., and Mockingbird Plantations, Inc.

### 1.  Yuma Mesa Jojoba, Ltd.[4]

When the petition was filed, the principal place of business
of Yuma Mesa was Dallas, Texas.

On December 31, 1982, Yuma Mesa was organized by Woodburn
and G. Dennis Sullivan (Sullivan) as a limited partnership with a
described purpose of conducting research and development
involving the jojoba plant.  Woodburn and Sullivan were co-

---

[4]    Although Cactus Wren is the named partnership in these
consolidated cases (since the petition filed by its tax matters
partner bears the lowest docket number), we first discuss the
formation of the Yuma Mesa limited partnership, which is the
primary partnership in these transactions.

general partners of Yuma Mesa, and Woodburn was TMP.[5]  No investments in Yuma Mesa were made prior to December 31, 1982, and no activity, other than document execution, concerning Yuma Mesa occurred during 1982.  The parties have stipulated that Yuma Mesa began business on December 31, 1982.  Using the accrual method of accounting and an election under section 174, Yuma Mesa deducted $1,298,031 as research and development expenses for the taxable year ending on December 31, 1982.  However, no activity under the research and development agreement occurred prior to December 31, 1982.

In 1982, Woodburn and Sullivan were partners in the law firm of Woodburn and Sullivan located in Dallas, Texas.  Sometime in 1982, one of the principals of the accounting firm Meinke, Damer, and Peterson[6] (Meinke firm) approached Sullivan or Woodburn regarding the possibility of having both of them serve as the general partners of a limited partnership with a described purpose of conducting research and development of the jojoba plant and its product, the jojoba nut (or bean).  Sullivan and Ray Meinke (Meinke), had known each other since Sullivan's graduation from law school in 1963.  Over the years, they

---

[5]    William Woodburn retired in 1985 for health reasons and resided in Hawaii at the time of trial.  His co-general partner, G. Dennis Sullivan (Sullivan), testified at trial.  Sullivan is a party to these cases pursuant to sec. 6226(c) and (d).

[6]    The principals were Raymond Meinke (Meinke), Keith Damer (Damer), and Marlin Peterson (Peterson).

established a social and professional relationship.  As a result of Sullivan's personal relationship with Meinke, Sullivan and Woodburn were designated as co-general partners of Yuma Mesa.

The existence of the jojoba industry came to the attention of the principals of the Meinke firm through the efforts of a business client, Almand, who attended a seminar on jojoba and reported that at the seminar he had been told that jojoba was "the thing of the future."  Almand's enthusiasm about jojoba led the principal members of the Meinke firm to conduct their own inquiry into the jojoba industry.  This inquiry included many phone calls and requests for prospectuses and copies of agreements used in setting up a jojoba venture.  Satisfied with the information they received, the principals of the Meinke firm decided to become involved in the jojoba industry.

Sullivan and Woodburn also investigated the jojoba industry.  Neither Woodburn nor Sullivan, both attorneys, had any prior experience in agriculture or in the growing of jojoba.  Woodburn and Sullivan attended two seminars aimed at potential investors in the jojoba industry, and Woodburn gathered together some available literature on jojoba.  At least one, if not both, of the seminars Woodburn and Sullivan attended was organized by the Meinke firm.

Yuma Mesa was financed through a private placement as described infra.  The operation was conducted by Hilltop Plantations, Inc., and Mesa Plantation, Inc., with management and

supervision by Agricultural Investments, Inc., pursuant to contract, as described infra.

Sullivan never traveled to Yuma, Arizona, to inspect the site of the plantation. Woodburn visited the site in Yuma two or three times before the abandonment of the partnership. As general partners, Sullivan and Woodburn sent photographs and letters regarding the growth of the jojoba plants to Yuma Mesa's limited partners at least twice a year.

Toward the end of 1986 it became apparent that the weather in Yuma, Arizona, would not permit successful operation of a jojoba plantation. The cold winter temperatures damaged the flowers on the jojoba plants, preventing the development of the jojoba bean. The shareholders of Hilltop Plantations, Inc., the research contractor, believed that wind machines were necessary to overcome the effect of the cold weather. The general partners of Yuma Mesa were unable to raise the additional capital needed from investors to purchase the wind machines. Yuma Mesa then abandoned development of plantation I in 1987.

### a. The Private Placement Memorandum

The Meinke firm, with the assistance of counsel, prepared the private placement memorandum (the offering) for Yuma Mesa. Sullivan and Woodburn reviewed draft copies of the offering before any subscriptions were taken for Yuma Mesa. Neither Woodburn nor Sullivan participated in raising money for Yuma Mesa. The funds were raised for Yuma Mesa through the networking

efforts of the Meinke firm. The offering, dated July 30, 1982, provided for a maximum capitalization of $1,714,300 consisting of 140 limited partnership units, at $12,245 per unit. Each unit consisted of a cash downpayment of $3,571 and an interest-bearing promissory note in the principal amount of $8,674, payable over a period of 48 months with interest of 10 percent per year, at the rate of $220 per month. The offering was limited to "qualified investors," described as investors with a minimum net worth (exclusive of home, furnishings, and automobiles) of $150,000 and/or investors who estimate that some portion of their current calendar year taxable income will be subject to a combined Federal and State income tax rate of 35 percent or more, or had gross income in the previous taxable year of not less than $75,000. The Yuma Mesa partnership subscribed 112 units for a total capitalization of $1,371,440, which facilitated farming operations on 130 acres of real property located in the environs of Yuma, Arizona, for a period of approximately 4 years.

According to the offering circular, Yuma Mesa was to be "formed to engage in research and development and, thereafter, participate in the marketing of the products of the jojoba plant, including, but not limited to, the beans, liquid wax and other by-products." The offering circular identified Hilltop Plantations, Inc., as the contractor selected to carry out the research and development (R&D) program under an R&D Agreement.

b. Hilltop Plantations, Inc.

Hilltop Plantations, Inc. (HTP), was a Texas corporation owned in equal shares by Marlin Peterson, Raymond Meinke, Keith Damer (principals of the Meinke firm) and one of the accounting firm's clients, Almand.  HTP was capitalized with $1000, the minimum amount required under Texas law.  Each shareholder contributed $250.  HTP executed an exclusive research and development contract with Yuma Mesa on December 31, 1982, for the stated purpose of "conducting research to develop a commercially marketable product from the seed or beans produced from the plantation on which the research is conducted."  No other bids were considered for the role of prime research contractor.  As the prime research contractor, HTP then further subcontracted the research and development work to Mesa Plantations, Inc.  Mesa Plantations, Inc., in turn, signed an agreement with Agricultural Investments, Inc. (AI), for AI to manage and supervise work on the plantation.

### c.  Mesa Plantations, Inc.

Mesa Plantations, Inc. (Mesa), an Arizona corporation, was a wholly owned subsidiary of HTP.  Therefore, the shareholders of HTP--Peterson, Meinke, Damer, and Almand--controlled the activities of Mesa.

On August 5, 1982, Mesa entered into an Agricultural Lease Agreement with Hilltop Ventures, a Texas general partnership, for 130 acres in Yuma, Arizona, with a purpose, according to the recitation in the lease, to conduct "a Research and Development

program for the purpose of undertaking research and thereafter developing a jojoba plantation." The partners in Hilltop Ventures--Peterson, Meinke, Damer, and Almand--were also the sole shareholders of HTP. Under the terms of this lease, Mesa was to pay a rental fee of $450 per acre, per year, for a period of 20 years, starting on October 1, 1982. Mesa, as lessee, in addition to conducting a broadly described "R&D Program", was required to furnish all material, labor and equipment, seed, fertilizer, and supplies for the farm, maintain all wells and irrigation and improvements to the property in working order, pay all utility charges and insurance costs, and pay for all subcontractors. The lessor was required to pay tax and assessments on the premises.

Concurrently with the execution of the research and development agreement between Yuma Mesa and HTP, on December 31, 1982, Yuma Mesa executed an exclusive license agreement with Mesa. This exclusive license agreement granted Mesa "the exclusive right to utilize the technology developed for the account of the Licensor * * * [Yuma Mesa]," in exchange for "royalties * * * payable to Licensor * * * [Yuma Mesa] based upon cumulative annual gross revenue from sales," of the seeds or beans of the jojoba plant.

### d.  Agricultural Investments, Inc.

On December 31, 1982, Mesa entered into a management contract with AI, a California corporation, to develop the 130 acres leased from Hilltop Ventures as a jojoba plantation

(plantation I).  Don and Kelly Shooter owned AI.  Earlier in the year, the Shooters told the principals of the Meinke firm that the climate in Yuma, Arizona, was suitable for growing jojoba.[7] Don Shooter was the onsite manager and handled all of the activities related to plantation I.  No one from AI testified at the trial.

AI provided the physical labor involved in the preparation of plantation I for farming jojoba and the maintenance of the jojoba plantation.  Pursuant to its management contract with Mesa, AI tilled the ground, planted the jojoba, installed the irrigation system, and applied herbicide and fertilizer to the jojoba.  Funding for these activities was provided pursuant to the contracts described above among Yuma Mesa, HTP, Mesa, and AI.

e.  Hilltop Ventures, later Townhill Equities, Inc.

Hilltop Ventures[8] was originally formed as a general

---

[7]     Joint exhibit 3-C, Description of the Project, as set forth in the private placement memorandum states:

Climatic conditions in the area * * * [Yuma, AZ] are believed to be quite favorable for growing Jojoba. High and low daily temperatures recorded since 1949 have ranged from a summer high of 119˚F to a winter night-time low of 22˚F.  Average annual rainfall is approximately three inches.

[8]     These cases concern the planting of jojoba on 160 acres owned by Hilltop Ventures.  Throughout the trial, witnesses refer alternately to Hilltop Ventures and Hilltop Equities.  Hilltop Equities, a general partnership, owned another 160 acres of land in Yuma, Ariz., that might have been developed as a jojoba plantation if Yuma Mesa and Cactus Wren had been successful. Hilltop Equities was capitalized by its general partners,
(continued...)

partnership that purchased 160 acres for farming of jojoba in Yuma, Arizona, in March or April of 1982. Peterson, Meinke, Damer, and Almand, the original members of the partnership provided the capital for the purchase of the 160 acres. There is no evidence in the record regarding the amount of capital provided by Peterson, Meinke, or Damer. Almand, a 25-percent owner in both HTP and Mesa, advanced $100,000 to Hilltop Ventures to purchase this land. Funds paid for subscriptions to Yuma Mesa and Cactus Wren were used subsequently to repay the $100,000 Almand advanced Hilltop Ventures as a downpayment for the land. Additionally, Almand provided working capital as needed to keep the Hilltop Ventures operating. Hilltop Ventures purchased the irrigation equipment necessary to prepare the land in Yuma, Arizona, for the planting of jojoba. Otherwise, the land did not need extensive development work and was suitable for immediate farming.

Subsequent to the purchase of the 160 acres in Yuma, Arizona, in order to limit the shareholders' liability, Hilltop Ventures was incorporated in Texas as Townhill Equities, Inc., also owned in equal shares by Peterson, Meinke, Damer, and Almand. Following a tax-free exchange, Townhill Equities, Inc.,

---

[8](...continued)
Peterson, Meinke, Damer, and Cecil Almand, with $80,000 cash, and the balance in notes. Testimony at trial indicates that the $80,000 investment was repaid through proceeds of "land lease" payments under the rental agreement.

succeeded Hilltop Ventures as owner of the 160 acres in Yuma, Arizona.

As previously noted, on August 5, 1982, Hilltop Ventures, as lessor, entered into an agricultural lease agreement, effective October 1, 1982, with Mesa, the lessee.  Pursuant to the terms of the agreement, Hilltop Ventures leased 130 acres[9] of the total 160 acres to Mesa for the purposes of carrying out the research and development program as described therein.  Because the Yuma Mesa offering had not been completely sold, a reduction occurred in the leased acreage from the original 160 to 130 acres.  The term of the lease was for 20 years with the basic rental of $450 per acre, per year, payable in advance.

2.  Cactus Wren Jojoba, Ltd.

When the petition was filed, the principal place of business of Cactus Wren was Dallas, Texas.

On December 31, 1983, Almand organized Cactus Wren, as a

---

[9]    The legal description of the property was attached as exhibit A to the lease agreement.  The property was described as follows:

> All that real property situated in the County of
> Yuma, State of Arizona described as follows:  The
> Northeast Quarter (1/4) of Section Fourteen (14),
> Township Ten (10) South, Range Twenty-three (23)
> West, Gila and Salt River Base and Meridian, Yuma
> County, Arizona, being 160 acres more or less.

A handwritten drawing reflecting the configuration of the real estate subject to the lease accompanied the legal description. The handwritten drawing clearly demonstrated that only 130 acres were subject to the lease.

limited partnership with a described purpose of conducting research and development involving the jojoba plant.  Since Yuma Mesa had raised only enough funds to plant jojoba on 130 acres of the 160 acres owned by Hilltop Ventures, Cactus Wren was designed to raise additional capital from investors to cover the cost of planting jojoba on the remaining 30 acres owned by Hilltop Ventures.  As a result of his involvement with Yuma Mesa, Almand volunteered to become the general partner of Cactus Wren.  Almand was engaged in business as a general contractor and had no previous experience farming jojoba.  Almand claims to have first obtained information regarding investments in jojoba from the principals of the Meinke firm.[10]

When Almand became general partner of Cactus Wren, he already had invested in another limited partnership, Yuma Mesa, discussed above.  Almand's investment in Yuma Mesa was approximately $100,000.  As an investor in Yuma Mesa, Almand visited the site of plantation I numerous times and spoke with Don and Kelly Shooter, the farm managers employed by AI.

As general partner, Almand visited the site of plantation II approximately six to eight times over a period of 4 to 5 years and sent out four letters to the limited partners reporting on

---

[10]    Peterson, a member of the Meinke firm, testified that Almand brought the information about investing in jojoba to the firm after he attended a seminar on the subject.  The precise chronology of the investigation by Almand and the three members of the accounting firm is immaterial.

the growth of the jojoba plants.  Each letter included photographs of the jojoba plants.

By 1986, Almand had learned that the cold night weather in Yuma prevented the growth of the jojoba beans and that wind machines were needed to prevent the frost damage.  Almand could not raise the additional capital from the investors in Cactus Wren to purchase the wind machines.  Almand conceded that he was not able to raise the additional capital due to the recent passage of the 1986 Tax Reform Act which eliminated taxpayers' interest in "investments" structured like the partnerships here in issue.  Cactus Wren abandoned development of plantation II in 1987.

### a.  The Private Placement Memorandum

The private placement memorandum (the offering) for Cactus Wren, dated April 3, 1983, provided for a maximum capitalization of $343,000 consisting of 140 limited partnership units, at $2,450 per unit.  The purchase price was payable in cash upon execution of the subscription agreement.  The Cactus Wren partnership ultimately was capitalized at $196,000, all cash, consisting of 80 units at $2,450 per unit.  Cactus Wren was funded totally with cash because the purchase of rooted cuttings required a large initial capital outlay.  According to the offering, Cactus Wren was to "engage in research and development and, thereafter, participate in the marketing of the products of the jojoba plant including, but not limited to, the beans, liquid

wax and other by-products."  The offering identified Mockingbird Plantations, Inc., as the contractor selected to carry out the R&D program.

### b.  Mockingbird Plantations, Inc.

Mockingbird Plantations, Inc. (MBP), was a Texas corporation established to be the prime research contractor for Cactus Wren. Peterson, Meinke, Almand, and Damer, the sole shareholders, owned equal shares in MBP.  The ownership of MBP mirrored that of HTP, the prime research contractor for Yuma Mesa.  On December 31, 1983, MBP executed an exclusive research and development contract with Cactus Wren, in which Cactus Wren engaged MBP "for the purpose of conducting research to develop a commercially marketable product from the seed or beans produced from the plantation on which the research is conducted."  Cactus Wren paid MBP $164,645 on December 31, 1983.  Cactus Wren solicited no other bids for this position.

Concurrently with the research and development contract, Cactus Wren entered into a license agreement with MBP that gave MBP "the exclusive right to utilize the technology developed for the account of the Licensor * * * [Cactus Wren]" in consideration for the payment by MBP of royalties based on the gross revenue from commercial farming and marketing of the jojoba plantation.

MBP, as a newly formed research and development contractor, had no experience in the jojoba field.

### c.  Agricultural Investments, Inc. (AI)

On December 31, 1983, MBP entered into a verbal agency agreement with Mesa, described in a written memorandum of agency agreement dated August 5, 1985.  Pursuant to the terms of this agreement, Mesa engaged AI in a research and development management agreement similar to the agreement Mesa negotiated between AI and Mesa's parent corporation, HTP.  AI handled all of the physical work that occurred on the 17.2-acre plantation related to Cactus Wren.

### d.  Townhill Equities, Inc.

On December 31, 1983, MBP leased 17.2 acres[11] (plantation II) from Townhill Equities, Inc., "for the purpose of undertaking research and thereafter developing a jojoba plantation of approximately 17.2 acres".  Under the terms of this lease, Mesa agreed to pay a rental fee of $450 per acre, per year, for a period of 20 years, starting on December 1, 1983.  Plantation II was located adjacent to plantation I.  Townhill Equities, Inc., and MBP were both owned in equal shares by Peterson, Meinke, Damer, and Almand.

### 3.  The Expert--Patrick Luna

Patrick Luna (Luna) testified for respondent as to whether

---

[11]    The legal description of the property was attached as exhibit A to the lease agreement.  The property was described as follows:

> The Northeast quarter (NE1/4) of Section Fourteen (14), Township Ten (10) South, Range Twenty-three (23) West, Gila and Salt River Base and Meridan, Yuma County, Arizona.

any research or experimentation activities were conducted pursuant to the exclusive research and development agreements entered into between Yuma Mesa and HTP, and between Cactus Wren and MBP, and as to the extent and nature of any such research activities. Luna is an engineer employed by the Internal Revenue Service in Dallas, Texas. He visited the site of the jojoba plantations in Yuma, Arizona, and inspected the growing jojoba. He is qualified to testify as an expert in the instant cases as to the matters set forth in his report. Petitioners did not call an expert witness on their behalf.

In the report prepared with respect to the Yuma Mesa partnership, Luna concluded that the activities conducted on the 130 acres controlled by Yuma Mesa between December 31, 1982, and December 31, 1986 (plantation I), were aimed at the creation of a mature jojoba farm and were not designed or carried out for the purpose of acquiring information about jojoba that was unknown at the time. Luna found that few, if any, scientific procedures were established for the conduct of the proposed research. There was no outline or timetable for completion of any proposed R&D project.

Luna concluded that investigation and evaluation of the suitability of the climate in Yuma, Arizona, for raising jojoba was not a research endeavor undertaken by Yuma Mesa. If, in fact, climatic conditions for growing jojoba had been a goal of

the research, there would have been no consideration given to altering the climatic conditions at the plantation with wind machines. For a research project, Luna explained, the procedures and conditions would have been followed to a conclusion so that the researchers could learn from the outcome. The attempt to obtain financing to purchase wind machines reflected an attempt to continue the commercial operation of the plantation as a farming operation.

Luna indicated that some of the projects or activities on the 130-acre tract farmed for Yuma Mesa during the period in question might have been conducted as research activities. The two areas of possible research activity were: (1) Herbicide testing; and (2) the effects of water conservation and fertilizer utilization on jojoba. Luna estimated that of the 130 acres available for research activities, activities that might have been conducted for research were only carried out on approximately 14 acres. The record does not establish whether the studies in question were conducted entirely on the land devoted to operations for Yuma Mesa. Yuma Mesa did not provide Luna with any documentation indicating amounts paid or costs incurred by the partnership or its representatives for any of the studies.

In the report he prepared with respect to the Cactus Wren partnership, Luna concluded that the activities performed on the

17.2 acres controlled by Cactus Wren (plantation II) were predominately aimed at the creation of a mature jojoba farm and were not for the purpose of acquiring information about jojoba that was unknown at the time. Luna found no substantial evidence that any research was conducted.

Peterson and others had predetermined that the jojoba cultivated by Cactus Wren on plantation II would be grown using the rooted cutting method. The decision to use rooted cuttings on plantation II applied already existing knowledge about jojoba farming.

Additionally, MBP provided Luna with no expense records supporting an allocation of the contract fee ($164,057) among qualifying and nonqualifying activities under section 174.

In the FPAA's, respondent determined that Cactus Wren and Yuma Mesa were not entitled to deductions claimed for tax counseling fees and that Yuma Mesa was not entitled to a deduction claimed for guaranteed payments to partners. Petitioners presented no evidence on these issues at trial and did not dispute respondent's determinations by oral argument or on brief. Accordingly, we have treated these issues as conceded by petitioners.

OPINION

This partnership proceeding is governed by the procedural rules of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648, codified as

secs. 6221-6233.  Under section 6221, the tax treatment of
partnership items is determined at the partnership level.  We
conclude that Yuma Mesa and Cactus Wren are not entitled to
section 174(a) research and experimental expense deductions for
1982 and 1983 because petitioners did not directly or indirectly
engage in research or experimentation.  In addition, we hold that
both of the limited partnerships lacked a realistic prospect of
entering a trade or business.  Zink v. United States, 929 F.2d
1015, 1021 (5th Cir. 1991).

This Court previously has addressed the deductibility of
purported research and development expenditures under section 174
by limited partnerships formed for the purported purpose of
engaging in agricultural research and development of the jojoba
plant.  Glassley v. Commissioner, T.C. Memo. 1996-206; Stankevich
v. Commissioner, T.C. Memo. 1992-458.  In the Glassley and
Stankevich cases, we held that the taxpayers were not entitled to
deductions for research and experimentation expenditures under
circumstances similar to those presented in these consolidated
cases.

The evidence presented in these cases persuades us that the
R&D agreements before us were mere window dressing, designed and
entered into solely to decrease the cost of participation in the
jojoba farming venture for the limited partners through the
mechanism of a large upfront deduction for expenditures that in
actuality were capital contributions.  Glassley v. Commissioner,

supra; Stankevich v. Commissioner, supra.

A.  Research and Experimental Expenditures for 1982 and 1983

Section 174 allows a taxpayer[12] to elect to treat research and experimental expenditures paid or incurred during the taxable year "in connection with" the taxpayer's trade or business as expenses which are not chargeable to capital account.  The expenditures so treated are allowed as a deduction.  Treasury regulations provide that the expenditures may be paid or incurred for research or experimentation carried on by the taxpayer or by another on the taxpayer's behalf.  Sec. 1.174-2(a), Income Tax Regs.

Petitioners contend that the expenditures here in issue qualify under the statutory standard.  Respondent argues, first, that the expenditures in issue were not "research and experimental expenditures" and, secondly, that Yuma Mesa and Cactus Wren had no realistic prospect of engaging in a trade or business related to jojoba farming and could at most act as passive investors because of the existence of exclusive licenses.  Accordingly, respondent concludes that petitioners did not pay or incur "research or experimental expenditures" in connection with their "trade or business."  We agree with respondent on both counts.

The term "research or experimental expenditures" as used in

---

[12]    The "taxpayer" for this purpose is the partnership.  Cf. Campbell v. United States, 813 F.2d 694, 695-696 (5th Cir. 1987).

section 174 means "expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense." Sec. 1.174-2(a)(1), Income Tax Regs. This regulation further provides:

> The term [research or experimental expenditures] includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys, management studies, consumer surveys, advertising or promotions. [Id.] * * *

Respondent claims that the amounts paid to HTP and MBP by Yuma Mesa and Cactus Wren do not fall within the purview of the quoted regulation and are not deductible under section 174. Respondent contends that the amounts expended by Yuma Mesa and Cactus Wren were incurred only in connection with a farming enterprise and that the objective of the limited partnerships was to develop commercial plantations for the farming of jojoba through the work of AI. Respondent argues that the activities of AI were, at most, field trials and more likely were simply farming activities directed towards maximizing the potential production of the jojoba plantations. Moreover, respondent contends that on plantation II no research whatsoever was performed by AI. Petitioners contend that AI, pursuant to its management contract with HTP and MBP, conducted valid research or

experimentation regarding cultivation of the jojoba plant on behalf of Yuma Mesa and Cactus Wren, and consequently, under section 174(a)(1), Yuma Mesa and Cactus Wren are entitled to deduct the contract fees paid HTP and MBP for such research or experimentation. Respondent's determinations are presumed correct, and petitioners have the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Attempts to farm jojoba commercially do not represent research and development in the experimental or laboratory sense. Glassley v. Commissioner, supra; Stankevich v. Commissioner, supra. AI attempted to develop jojoba plantations that would be farmed for the oil seed. The limited partners of Yuma Mesa and Cactus Wren would realize income only through the sale of the jojoba oil if the plantations had been successful. AI furnished only one status report on the progress of the purported research and development on plantation I. AI did not maintain a laboratory on either plantation or adequately document any of its purported research and development costs.

We agree with respondent's expert witness that AI's actions were no more than what any farmer would do in the ordinary course of preparing to grow a crop for commercial harvesting. Petitioners chose not to call an expert witness in this trial. There is no evidence suggesting that AI's efforts would lead to patentable technology or even know-how. Additionally, we note that Don Shooter, the farm manager for AI, did not testify for

petitioners concerning any purported research or experimental work for petitioners. A party's failure to introduce evidence within his possession which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The record shows that these cases are further examples of efforts by promoters and investors in the early 1980's to reduce the cost of commencing and engaging in the farming of jojoba by claiming, inaccurately, that capital expenditures in jojoba plantations might be treated as research or experimental expenditures for purposes of claiming deductions under section 174. Glassley v. Commissioner, T.C. Memo. 1996-206; Stankevich v. Commissioner, T.C. Memo. 1992-458.

Since Yuma Mesa and Cactus Wren did not directly or indirectly engage in research or experimentation, we hold that they are not entitled to a deduction for these expenditures under section 174.

B. Requirement of a Trade or Business

In addition, we hold that the activities of Yuma Mesa and Cactus Wren did not constitute a trade or business. To be entitled to deductions for research and development expenditures, a taxpayer need not be currently producing or selling any product. Snow v. Commissioner, 416 U.S. 500, 503-504 (1974); Zink v. United States, 929 F.2d at 1021. However, not every

expenditure having some relationship to research and experimentation is deductible under section 174(a). The Supreme Court's decision in Snow v. Commissioner, supra, "makes it important to determine whether the prospects for developing a new product that will be exploited in a business of the taxpayer are realistic". Spellman v. Commissioner, 845 F.2d. 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403. Unless there is a realistic prospect that the taxpayer will ultimately engage in a trade or business that exploits the developed technology, a research and experimental expenditure cannot be said to have been paid or incurred "in connection with" a trade or business. Harris v. Commissioner, 16 F.3d 75, 81 (5th Cir. 1994), affg. T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992); Zink v. United States, supra at 1023; Spellman v. Commissioner, supra at 148-149; Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991).

The management of investments, however, is not a trade or business, regardless of how extensive or complete the portfolio or how much time is required to manage such investments. Green v. Commissioner, 83 T.C. 667, 689 (1984). This Court and other Courts have scrutinized claimed research and development expenditures to distinguish those that are legitimate from those that are merely designed to shelter the income of passive investors. See, e.g., Diamond v. Commissioner, supra; Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir.

1987); <u>Green v. Commissioner</u>, <u>supra</u>; <u>Spellman v. Commissioner</u>, T.C. Memo. 1986-403, affd. 845 F.2d 148 (7th Cir. 1988). The controlling inquiry, where a partnership is claiming deductions under section 174, is whether there is a realistic prospect that the technology to be developed will be exploited in a trade or business of the entity in question. See <u>Diamond v. Commissioner</u>, <u>supra</u>. Mere legal entitlement to enter into a trade or business does not satisfy this test. Instead, "The legal entitlement must be backed by a probability of the firm's going into business." <u>Levin v. Commissioner</u>, 832 F.2d at 407.

In making this determination, we consider such facts and circumstances as the intentions of the parties to the research and development contract, the amount of capitalization retained by the partnership during the research and development contract period, the exercise of control by the partnership over the person or organization conducting the research and development, the existence of an option to acquire the technology developed by the organization conducting the research and development and the likelihood of its exercise, the business activities of the partnership during the years in question, and the business experience of the partners. See <u>Glassley v. Commissioner</u>, T.C. Memo. 1996-206; <u>Mach-Tech, Ltd. Partnership v. Commissioner</u>, T.C. Memo. 1994-225, affd. without published opinion 59 F.3d 1241 (5th Cir. 1995); <u>Stankevich v. Commissioner</u>, T.C. Memo. 1992-458; <u>Stauber v. Commissioner</u>, T.C. Memo. 1992-128.

A taxpayer may be precluded from engaging in a trade or business with respect to the developed technology if the taxpayer disposes of all incidents of ownership in the technology by granting an exclusive license to a third party in exchange for a royalty interest. Diamond v. Commissioner, supra at 438; Levin v. Commissioner, 87 T.C. at 725-728; Green v. Commissioner, supra at 689. "It is the licensee, rather than the licensor, who earns profits from the sale of the product; the licensor merely collects royalties from the licensee. Thus, by granting an exclusive license, the licensor is deprived of control over the manufacture, use and sale of the product, and the licensee is the one engaged in the trade of business of exploiting the developed technology." Medical Mobility Ltd. Partnership I v. Commissioner, T.C. Memo. 1993-428. As a mere passive investor, the partnership will not be entitled to a deduction under section 174(a) for research and experimental expenditures. Zink v. United States, supra at 1022-1023; Diamond v. Commissioner, supra at 443.

In Green v. Commissioner, supra, a partnership entered into a research and development agreement under which it divested itself of all ownership rights in the technology to be produced under the agreement. We held that the taxpayer's partnership could not have engaged in a trade or business as it had disposed of all of the incidents of ownership by assigning all its rights in the technology to a third party. Green v. Commissioner, supra

at 689. "Following this assignment, the partnership's activities were purely ministerial; the taxpayers were no more than mere investors." Diamond v. Commissioner, supra at 438.

In Levin v. Commissioner, 87 T.C. at 727-728, we held that the grant of an exclusive license foreclosed the possibility that the licensor could be engaged in a trade or business in connection with the licensed product, as the licensor was deprived of control over the product. "An entity with no control over activities in which it invests is more properly classified as an investor and cannot be engaged in a trade or business in connection with those activities." Diamond v. Commissioner, supra at 443.

In Stankevich v. Commissioner, supra, the limited partnership entered into an exclusive license agreement whereby the limited partnership granted the prime contractor licenses to any technology resulting from the prime contractor's research and development efforts. As a royalty, the limited partnerships received 50-percent profit interests in the jojoba crops grown on the acreage allocated to the limited partnerships. We held that the prime contractor conducted no research and experimentation but instead sought to farm commercially. We further held that the limited partnerships were not entitled to a deduction for research and experimentation expenditures under section 174(a) because the limited partnerships were not engaged directly or indirectly in a trade or business because of the granting of the

exclusive licenses.  We see no difference between the situation in Stankevich v. Commissioner, supra, and the facts presented in the cases here under consideration.  See also Glassley v. Commissioner, supra.

In Diamond v. Commissioner, supra, the partnership granted an option to a research contractor to acquire an exclusive license to the new technology at some future time.  Because the option could have been exercised for a relatively nominal amount, we concluded that there was no realistic prospect that the partnership would ever enter any trade or business relating to the technology.  Id. at 440-441.

The cases before us now involve the simultaneous execution by the limited partnerships of an R&D agreement and an exclusive license agreement.  Although executed a year apart, the R&D agreements entered into by Yuma Mesa and Cactus Wren were substantially identical.

Section B, paragraph 5 of the R&D agreement entered into between Yuma Mesa and HTP on December 31, 1982, stipulates in part:

> All technology developed, whether or not capable of patent or trademark registration, shall be the sole property of Investor * * * [Yuma Mesa] and shall be the subject of the License Agreement being concurrently executed by the Investor * * * [Yuma Mesa] and Mesa Plantations, Inc.

Section B, paragraph 5 of the R&D agreement entered into between Cactus Wren and MBP on December 31, 1983, stipulates in part:

> All technology developed, whether or not capable of patent or trademark registration, shall be the sole property of Investor * * * [Cactus Wren] and shall be the subject of the License Agreement being concurrently executed by the Investor * * * [Cactus Wren] and Townhill Equities, Inc.

At all times, Mesa and Townhill Equities, Inc., had identical ownership.

Section B, paragraph 1 of both of the R&D agreements further provide that "The research to be performed shall be solely at the direction of the Contractor * * * [HTP, MBP] and the Investor * * * [Yuma Mesa, Cactus Wren] shall have no right of participation therein."

The exclusive license agreements executed by Yuma Mesa and Cactus Wren were also identical. On December 31, 1982, Yuma Mesa executed an exclusive license with Mesa, granting Mesa (Licensee), "the exclusive right to utilize the technology developed for the account of the Licensor * * * [Yuma Mesa]" in return for the payment by the Contractor/Licensee * * * [MBP] of royalties based upon future sales. Pursuant to the licensing agreement, these "royalties shall be payable to Licensor * * * [Yuma Mesa] based upon cumulative annual gross revenue from sales as follows:

| | |
|---|---|
| (a) 0 to $242,100 | 0.0% |
| (b) $242,101 to $322,800 | 3.0% |
| (c) $322,801 to $403,500 | 10.0% |
| (d) $403,501 to $565,000 | 25.0% |
| (e) $565,001 to $807,100 | 37.0% |

(f) Over $807,100                42.5%"

It is clear from the words of the licensing agreement that Yuma Mesa was not going to be actively involved in the development of the jojoba plantation.  As paragraph 2 in section A points out:

> Said agreement provides that upon the sole determination by Hilltop Plantations, Inc. as Contractor, that the seed and/or bean of the jojoba plants developed may be sold commercially, then and in that event commercial farming and marketing shall be conducted pursuant to this Agreement.

The licensing agreement also states "that this Agreement in no way constitutes a partnership or a joint venture between Licensor * * * [Yuma Mesa] and Licensee * * * [Mesa Plantations]."

The license agreement entered into between Cactus Wren and MBP, on December 31, 1983, gives MBP (Contractor/Licensee), "the exclusive right to utilize the technology developed for the account of the Licensor * * * [Cactus Wren]" in consideration of the payment by the Contractor/Licensee * * * [MBP] of royalties based upon future sales.  Pursuant to the licensing agreement, these "royalties shall be payable to Licensor * * * [Cactus Wren] based upon cumulative annual gross revenue from sales as follows:

        (a) 0 to $56,250               0.0%

        (b) $56,251 to $75,000         3.0%

        (c) $75,001 to $93,750        10.0%

        (d) $93,751 to $131,250       25.0%

        (e) $131,251 to $187,500      37.0%

        (f) Over $187,500                 42.5%"

     It is evident from the words of the licensing agreement that
Cactus Wren was not going to be actively involved in the
development of the jojoba plantation.  As paragraph 2 in section
A points out:

>      Said agreement provides that upon the sole
>      determination by Mockingbird Plantations, Inc. as
>      Contractor, that the seed and/or bean of the jojoba
>      plants developed may be sold commercially, then and in
>      that event commercial farming and marketing shall be
>      conducted pursuant to this Agreement.

The licensing agreement also states "that this Agreement in no
way constitutes a partnership or a joint venture between Licensor
* * * [Cactus Wren] and Licensee * * * [MBP]."

     "A taxpayer that funds research by another party in return
for royalties is clearly no more than an investor making a
capital contribution to the trade or business of another."  LDL
Research and Development II, Ltd. v. Commissioner, ___ F.3d. ___
(10th Cir., Sept. 8, 1997), affg. T.C. Memo. 1995-172.  It is
clear that Yuma Mesa and Cactus Wren funded the "research
activities" of HTP and MBP with the expectation of royalties from
the sale of the jojoba beans.  As the farm manager for both
plantation I and II, AI is the only entity that appears to have
been engaged in a trade or business related to jojoba farming.
The actions of the general partners and the four initial
investors in the project, including irregular visits to the
plantation sites and sending letters and photographs that

reported on the status of the maturing jojoba plants, were nothing more than the actions of interested investors keeping up with their investment.

Although the license agreements entered into by Yuma Mesa and Cactus Wren nominally had different parties as licensees, the licensees were controlled by the same four individuals. Yuma Mesa's licensee, Mesa, was controlled by HTP's shareholders Almand, Peterson, Damer, and Meinke.  Cactus Wren's licensee, MBP, was also owned in equal shares by Almand, Peterson, Damer, and Meinke.

AI entered into a management agreement on December 31, 1982, with Mesa to be the farm manager for plantation I.  On December 31, 1983, AI entered into a substantively identical management agreement with Mesa to be the farm manager for plantation II. Pursuant to these contracts the manager agreed:  (1) To develop and plant the property as a jojoba plantation; and (2) to manage, operate, and maintain the property as a jojoba plantation and to engage in research with respect to jojoba cultivation.

Included in the management agreement with Yuma Mesa for plantation I is a budget for the initial year that allocates $198,600 to development costs such as "clearing, demolition and spraying * * * grade fields * * * ripping * * * discing * * * seed jojoba * * * jojoba seed," among other things.  Based upon this management contract, we conclude that AI performed all of the physical work upon plantation I.

Included in the management agreement with Cactus Wren for plantation II is a budget for the initial year that allocates $43,800 to the purchase and planting of cloned plant material and $7,689 (for 7 months) to culturing costs, such as fertilizing, pest control, weeding, and other ongoing farm activities. Based upon this management contract, we conclude that AI performed all of the physical work upon plantation II.

From the formation to the abandonment of the partnerships, Yuma Mesa and Cactus Wren had no employees. See Harris v. Commissioner, 16 F.3d at 80 n.10. By contrast, AI employed two managers, Don and Kelly Shooter, and hired individuals to perform the actual farm work on the plantation. Additionally, AI had established itself in the jojoba farming industry as a plantation manager. By 1986, AI was running approximately 10 jojoba plantations, several which were planted prior to those of Yuma Mesa and Cactus Wren.

We do not accept the testimony of Peterson at trial that Mesa "did all the things that are required to raise jojoba." Although Mesa had been engaged as the research and development subcontractor, petitioners presented no evidence that Mesa had any employees or exercised any control over the activities on the jojoba plantations. From the evidence before us, it appears that Mesa's role was to ensure that the money paid by Yuma Mesa to HTP and by Cactus Wren to MBP for purported research and development went back to the shareholders of Hilltop Ventures, later Townhill

Equities, Inc., as lease payments. HTP, MBP, Hilltop Ventures, and Townhill Equities, Inc., were owned and controlled by identical parties--Almand, Peterson, Meinke, and Damer. Additional amounts were paid over to AI in accordance with the management agreements and budgets summarized above.

The passive nature and limited activity of Yuma Mesa and Cactus Wren, as well as their lack of control over all aspects of the investment, plainly demonstrate that the general partners of Yuma Mesa and Cactus Wren never intended that these partnerships would enter into a trade or business.[13] Neither Yuma Mesa nor Cactus Wren was adequately capitalized by the general partners for operation as a business in the long-term. Both Yuma Mesa and Cactus Wren had run out of capital by 1987 and were not able to purchase the wind machines. None of the general partners had the expertise necessary to operate a jojoba plantation. The contractual arrangements between Yuma Mesa and HTP and between Cactus Wren and MBP, in addition to Mesa, made the prospects unrealistic that the partnerships would ever be capable of entering into a trade or business with respect to any technology that might be developed. The actions of the general partners in

---

[13] As the Court of Appeals for the Fifth Circuit noted in Harris v. Commissioner, 16 F.3d 75 (5th Cir. 1994), affg. T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992): [T]hose cases in which a sec. 174 deduction was upheld may be distinguished by one dispositive factor: In each of the cases allowing the deduction, the entity that incurred the research expenses actually managed and actually controlled the use or marketing of the research. Id. at 79.

Yuma Mesa and Cactus Wren were wholly consistent with investor activity, not the activity of people engaged in an active trade or business.

After reviewing the record in the instant cases, we agree with respondent that Yuma Mesa and Cactus Wren did not pay the contract fees for research or experimentation to be conducted by HTP and MBP on behalf of the limited partnerships. Rather, for the reasons discussed above, we conclude that the moneys the limited partnerships remitted to HTP and MBP for the putative research or experimentation, in actuality, were paid for the limited partners' right to participate in the jojoba farming enterprise being operated by AI in Yuma, Arizona. In our view the R&D agreements were designed and entered into solely to provide a mechanism to disguise the capital contributions of the limited partners as currently deductible expenditures and thus reduce the cost of their participation in the farming venture.

Accordingly, we hold that petitioners did not incur deductible losses for research or experimentation expenditures under section 174. Respondent is sustained on this issue.

To reflect the foregoing,

<u>Decisions will be entered for</u>

<u>respondent</u>.